UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| COMMODITY FUTURES TRADING COMMISSION,<br><br>                     Plaintiff,<br><br>          v.<br><br>JON BARRY THOMPSON,<br><br><br>                     Defendant. | ECF Case No. 19-CV-9052<br><br><br>**COMPLAINT FOR INJUNCTIVE AND OTHER EQUITABLE RELIEF AND FOR CIVIL MONETARY PENALTIES UNDER THE COMMODITY EXCHANGE ACT <u>AND COMMISSION REGULATIONS</u>**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Commodity Futures Trading Commission (the "Commission"), by and through

counsel, alleges as follows:

## I.          <u>INTRODUCTION</u>

1.          During the period from at least in or around June 2018 through at least August

2018 (the "Relevant Period"), Jon Barry Thompson ("Thompson") employed a deceptive and

fraudulent scheme by knowingly or recklessly making false representations to customers

(generally "Customers") in connection with the purported purchase of virtual currency,

specifically Bitcoin, worth millions of dollars.  Contrary to Thompson's false representations,

neither he nor a company with which he was affiliated (the "Escrow Company") had possession

or control of the Bitcoin that was to be delivered to the Customers.  Bitcoin was never delivered

to the Customers and Customer funds were not safeguarded as promised.  Instead, Thompson

transferred Customer funds to accounts for the benefit of others, including to one or more

accounts of at least one company affiliated with Thompson.  In an effort to conceal from the

Customers the fact that they had been defrauded, Thompson made additional false

representations as to why he was unable to deliver the Bitcoin to them as promised.

2.      By this conduct, and as more fully alleged below, Defendant has engaged, is engaging, or is about to engage in fraudulent acts and practices in violation of the Commodity Exchange Act ("Act"), 7 U.S.C. §§ 1–26 (2012), and Commission Regulations ("Regulations"), 17 C.F.R. pt. 1–190 (2019), specifically Section 6(c)(1) of the Act, 7 U.S.C. § 9(1) (2012), and Regulation 180.1(a), 17 C.F.R. § 180.1(a) (2019).

3.      Accordingly, pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1 (2012), the Commission brings this action to enjoin such acts and practices and compel compliance with the Act.  In addition, the Commission seeks civil monetary penalties and remedial ancillary relief, including, but not limited to, trading bans, restitution, disgorgement, rescission, pre- and post-judgment interest, and such other relief as the Court may deem necessary and appropriate.

4.      Unless restrained and enjoined by this Court, Defendant is likely to continue to engage in the acts and practices alleged in this Complaint and similar illegal acts and practices.

## II.      JURISDICTION AND VENUE

5.      **Jurisdiction**.  This Court has jurisdiction over this action under 28 U.S.C. § 1331 (2012) (codifying federal question jurisdiction) and 28 U.S.C. § 1345 (2012) (providing that U.S. district courts have original jurisdiction over civil actions commenced by the United States or by any agency expressly authorized to sue by Act of Congress).  In addition, Section 6c(a) of the Act, 7 U.S.C. § 13a-1(a) (2012), provides that U.S. district courts have jurisdiction to hear actions brought by the Commission for injunctive and other relief or to enforce compliance with the Act whenever it shall appear to the Commission that any person has engaged, is engaging, or is about to engage in an act or practice constituting a violation of any provision of the Act or any rule, regulation, or order thereunder.

6.     The Commission has anti-fraud authority over the conduct and transactions at issue in this action pursuant to Section 6(c)(1) of the Act, 7 U.S.C. § 9(1) (2012), and Regulation 180.1(a), 17 C.F.R. § 180.1(a)(2019).

7.     **Venue**.  Venue properly lies with the Court pursuant to Section 6c(e) of the Act, 7 U.S.C. § 13a-1(e), because Defendant is found in, inhabits, or transacts business in this District, and because acts and practices in violation of the Act occurred, are occurring, or are about to occur, within this District.

### III.     THE PARTIES

8.     Plaintiff **Commodity Futures Trading Commission** ("Commission" or "CFTC") is an independent federal regulatory agency that is charged by Congress with the administration and enforcement of the Act and the Regulations.  The Commission maintains its principal office at Three Lafayette Centre, 1155 21st Street, N.W., Washington, D.C. 20581.

9.     Defendant **Jon Barry Thompson** is a resident of Easton, Pennsylvania. Thompson has never been registered with the Commission.

### IV.     FACTS

A.     **Background**

10.     Bitcoin is a form of cryptocurrency (a type of virtual currency), which is a decentralized, peer-to-peer form of electronic currency.  Cryptocurrency is a digital representation of value that can be digitally traded and functions as (1) a medium of exchange; (2) a unit of account; and/or (3) a store of value, but does not have legal tender status.  Unlike "fiat currency," like the U.S. dollar and the Euro, cryptocurrency is not issued by any jurisdiction and functions only by agreement within the community of users of that particular currency.

11.     Cryptocurrencies like Bitcoin are held by their owners in electronic "wallets." These wallets have unique addresses, which are designated by a string of letters and numbers.

Only an individual who possesses the unique "private key" associated with a wallet's address can access the cryptocurrency in that wallet. However, any individual can send cryptocurrency to any wallet. An individual does not have to submit any identifying information to any central authority to own a wallet, and therefore an individual can easily hold a wallet anonymously.

12.     A blockchain is a public, distributed electronic ledger. Whenever someone transfers cryptocurrency between wallet addresses, it is recorded on a blockchain. The blockchain records only the movement of cryptocurrency between the addresses; it does not by itself identify the holders of the cryptocurrency. The blockchain primarily involved in this case is the Bitcoin blockchain.

13.     Under Section 1a(9) of the Act, 7 U.S.C. § 1a(9), a "commodity" includes "all other goods and articles, . . . and all services, rights, and interests . . . in which contracts for future delivery are presently or in the future dealt in." This includes virtual currencies, such as Bitcoin and other cryptocurrencies.

14.     During the Relevant Period, Thompson and the Escrow Company were engaged in the business of purchasing and selling Bitcoin, along with other forms of cryptocurrency, and the Escrow Company also acted as an escrow agent for third parties engaged in the purchase and sale of Bitcoin. As part of these operations, Thompson solicited and received fiat currency, including U.S. Dollars and Euros, from Customers in various states and countries for the purpose of entering into or facilitating the Customer's purchase or sale of cryptocurrency.

**B.     Fraud Involving Customer-1**

15.     In or about June and July 2018, Thompson induced Customer-1 to send over $3 million to fund the purchase of Bitcoin after knowingly or recklessly making false representations to Customer-1 that he or the Escrow Company had the Bitcoin in hand and Customer-1's money could not be lost. After taking Customer-1's money and failing to provide

4

any Bitcoin in return, Thompson lied for days about why the deal had not worked out, about the location of the Bitcoin that the Escrow Company was supposed to deliver to Customer-1, and about Customer-1's money, which was never returned.

16.     Customer-1 is a business engaged in, among other things, trading Bitcoin and other cryptocurrency.  Throughout the Relevant Period, Customer-1 maintained offices in Jersey City, New Jersey, and New York, New York.

17.     In or about May 2018, the head cryptocurrency trader for Company-1 (the "Company-1 Trader") had a meeting at the office of an individual ("Individual-1") involved in cryptocurrency transactions.  During the meeting, Individual-1 told the Company-1 Trader that he was the representative of a seller of Bitcoin ("Seller-1") and that Seller-1 wanted to use the Escrow Company as an intermediary to sell its Bitcoin, potentially to Company-1.  Individual-1 did not disclose the identity of Seller-1 to the Company-1 Trader.

18.     On or about June 14, 2018, Individual-1 set up a Telegram chat room for the Company-1 Trader, Individual-1, and Thompson.  The Company-1 Trader (on behalf of Company-1), Thompson (on behalf of the Escrow Company), and Individual-1 (on behalf of Seller-1) then began negotiating the purchase of Bitcoin by Company-1 from Seller-1 through the Escrow Company.

19.     From the beginning of the discussions, the participants in the chat room contemplated that the Bitcoin purchase would involve an escrow agreement.  For example, on or about June 14, 2018, Thompson emailed the Customer-1 Trader a draft escrow agreement.  In addition, that same day, the Customer-1 Trader sent Thompson and Individual-1 Telegram messages asking "Where is escrow held?" and "I assume fee is paid by seller?"  Individual-1

responded with the name of a financial institution and "yes, seller wil [sic] pay - just for you [first name of the Customer-1 Trader]."

20.     On or about June 20, 2018, Thompson participated in a conference call with the Customer-1 Trader, the Chief Operating Officer for Customer-1, and outside counsel for Customer-1.  At the time of the call, the Customer-1 Trader was in New York, New York.

21.     During this call, Thompson purported to explain to those acting on behalf of Customer-1 the service that he and the Escrow Company provided and gave them false assurances that using the Escrow Company would eliminate any settlement risk (i.e., the risk that the transaction would close without the Bitcoin at issue being transferred to Customer-1). Thompson's false representations on the call included the following:

- "So we custody assets for folks that are trading, needing to trade, doing stuff, and then facilitate the trading.  So all we do is process one-sided orders that settle, right, and that way everybody who is a member of the network has full rights and there's no risk of settlement failure."  (Emphasis added).

- "In addition, when, umm, everything is [in] custody with me before the transaction commences, or it's a breach and the transaction can't start.  So cash is with me, coin is with me.  So the seller sends coin to me, the cash is with me . . . .  So the cash and coin are both within our control, and then when the transaction prices, we do an atomic swap."  (Emphasis added).

Thompson used the phrase "atomic swap" to mean instantaneously swapping the "cash and coin" that was in his possession, i.e., transferring the Bitcoin to Customer-1 and the "cash" to Seller-1.

22.     In addition, the parties to the call discussed a two-agreement structure, in which Customer-1 would enter one agreement with the Escrow Company and another agreement with another company with which Thompson was affiliated (the "Market Making Company"). Thompson proposed:

> And as an alternative, right, we have the market-making desk, which is a separate legal entity, different stakeholders, different everything, right? And if that's easier, we can just—[the Escrow Company] can act as an escrow wrapper.  We have another contract with which is a traditional escrow wrapper, right?  And this exact same transaction can be contracted through the market-making desk.  That way they can be the intermediaries to make the math work, and I can give you our traditional escrow agreement just as a wrapper.

23.     On or about the following day, June 21, 2018, the Customer-1 Trader sent Thompson a Telegram message attaching a draft master purchase agreement.  The Customer-1 Trader then asked Thompson via Telegram to send a draft escrow agreement.

24.     On or about June 21, 2018, the Customer-1 Trader sent an email to Thompson that stated in part:  "Please send your escrow agreement."  That same day, Thompson replied to the Customer-1 Trader with an email attaching a proposed escrow agreement.

25.     On or about June 22, 2018, Thompson sent the Customer-1 Trader a Telegram message regarding the draft master purchase agreement that stated:  "[A representative of the Escrow Company] can send over.  Changes are to make sure it complies with our process from the order.  <u>Cash and coin both in, in advance of transaction</u>.  Pricing, swap, then release." (Emphasis added).  Thompson sent this message to Customer-1 Trader in order to have him believe that both Customer-1's cash and Seller-1's Bitcoin would be in Thompson's and/or the Escrow Company's control before the transaction commenced.

26.     On or about June 26 to 27, 2018, the Customer-1 Trader and Thompson exchanged Telegram messages about the escrow account where Customer-1's funds were to be

held.  During those messages, the Customer-1 Trader repeatedly asked for information on the

security of the escrow account, and Thompson falsely assured the Customer-1 Trader that the

Escrow Company would maintain control of the cash deposited by Customer-1, and that no one

outside of the Escrow Company (except for the third-party wallet custodian service ("Wallet

Custodian")) would have access to the wallet containing Seller-1's Bitcoin before it was released

to Customer-1.  Specifically, Thompson and the Customer-1 Trader exchanged the following

messages (the Customer-1 Trader is referred to as "Trader"):

| | |
|---|---|
| Trader: | Due to the nature of you being seller/escrow agent at the same time [c]an you provide us with any documentation with [the financial institution where Customer-1 funds were to be held in escrow (the "Escrow Financial Institution")] so we can understand our security on the escrow with them involved? |
| Thompson: | I thought we were going 5o [sic] make [Market Making Company] market making seller and [Escrow Company] escrow the escrow? |
| Thompson: | [Escrow Financial Institution] is just an omnibus account. |
| Thompson: | This is why we segmented the transaction. |
| Trader: | Correct, but its semantics no? You are controller of both businesses |
| Trader: | To be clear, the MPA [master purchase agreement] says [the Escrow Company n]ot the market making side. |
| Thompson: | Yes, it should say [the Market Making Company]. |
| Thompson: | Slip on lawyers side, I did not share that with them.  My mistake. |
| Trader: | I assume you are a beneficial owner of [the Market Making Company]? |
| Thompson: | Partial, but control is [another individual]. |
| Trader: | It creates a conflict of interest so that's why we need extra security in the escrow agreement |
| Trader: | Or at least some added language |

| Trader: | Barry [Thompson] - will the BTC [Bitcoin] be sent to our wallet before the cash is sent to the seller after the transaction takes place? |
| --- | --- |
| Trader: | What transaction takes place first? |
| Trader: | It's not specified in your escrow contract. |
| Trader: | Who controls the private key to the wallet where the coins are sitting prior to the transaction? |
| Trader: | if you can explain that piece i think we'll be good to go. |
| Trader: | We can sign this mpa [master purchase agreement] and do a test trade tomorrow |
| Thompson: | [Wallet Custodian].  We never have control |
| Trader: | [Wallet Custodian] custody's [sic] the private key which is owned by whom? |
| Thompson: | Owned or controlled?  Radically different meaning |
| Trader: | Who has access to the private key prior to the trade |
| Thompson: | Everything at [Wallet Custodian] is a multisig [multisignature] environment where the keys |
| Thompson: | are segmented between a third-party trustee [Wallet Custodian] and the signatures. And as such [the Escrow Company] exercises the execution control, the customer does not.  Otherwise you could withdrawal [t]he funds in the middle of a transaction.  In addition, we do sometimes support true multisig with the customer, but for this use case that would actually radically slow down the conversation and the transaction. |
| Thompson: | So lets say the coin is in a wallet at [Wallet Custodian], who are the parties involved that must authorize the transaction |
| Thompson: | [the Escrow Company] executes, customer instructs |
| Trader: | So there is no point whereby the seller can call [Wallet Custodian] and ask for his coins to be moved |
| Thompson: | Absolutely not. They have no legal standing to even engage or talk to [Wallet Custodian] in any way shape or form.  If they have a login for authorization or other items related to that it's still under the [the Escrow Company's] command-and-control.  Under no |

9

| | circumstances Shelly [sic] buyer or seller ever have the ability to impact the transaction or withdrawal assets without [the Escrow Company's] approval. |
|---|---|
| Trader: | The cash that is moved within the omnibus [account] - you control right? |
| Trader: | Let's say I don't want to do a trade. |
| Trader: | how do i get my money out of that account. |
| Thompson: | You place a withdraw order and it is executed in the next hour of business hours. |

27.     Thompson reassured the Customer-1 Trader that Seller-1, whose identity was unknown to Customer-1, could not interfere with the transaction because the Escrow Company exercised "command-and-control" over the Bitcoin stored in a wallet with Wallet Custodian. Thompson informed the Customer-1 Trader that Seller-1 had no "legal standing" to "engage or talk to [Wallet Custodian] in any way shape or form" and "only [the Escrow Company] had execution control over this transaction."  Further, Thompson assured the Customer-1 Trader that the Escrow Company also controlled the cash that Customer-1 would send, so Customer-1 could simply ask for its money to be returned if Customer-1 decided not to trade before the transaction occurred.

28.     On or about June 27, 2018, Thompson emailed the Customer-1 Trader a welcome package with wire instructions.  The wire instructions directed that funds to be transmitted by US Fedwire should pass through a specified bank in New York, for further credit to an account "c/o J. Barry Thompson" at the Escrow Financial Institution, also located in New York, New York (the "Escrow Bank Account").  Thompson was the only authorized signatory on the account.

29.     Among other things, the welcome package included flow charts to explain what happens to currency transferred into the Escrow Bank Account.  The flow charts show that after

the customer transfers money, the Escrow Company will confirm receipt and a formal audit trail will be issued showing the customer the current account balance.  The flow charts also show that the customer must confirm amounts to be transferred from the Escrow Bank Account.  The flow charts do not indicate that currency may be transferred to accounts of third parties without the customer's approval and without either the Escrow Company or the customer receiving the Bitcoin.

30.     On or about June 27, 2018, the Customer-1 Trader emailed Thompson an executed version of the Master Purchase Agreement (the "MPA") between Customer-1 and the Market Making Company.  The MPA falsely represented that "[the Market Making Company] is a limited liability company organized under the laws of the state of Delaware."  The MPA was counter-executed by Thompson on behalf of the Market Making Company as its "Director, Escrow Transaction Coordination."

31.     On or about June 28, 2018, Thompson emailed the Customer-1 Trader the counter-executed escrow agreement (the "Escrow Agreement").  Under the Escrow Agreement, the Market Making Company, as the immediate seller of the Bitcoin, and Customer-1, as the buyer, engaged the Escrow Company to hold and disburse assets in accordance with the terms and conditions of the MPA.  The Escrow Company was to function as a "depository" to facilitate trades between the Market Making Company and Customer-1.  The Escrow Agreement further provided that, as to escrow fees, "[t]he Parties are liable for the fees set forth in the Master Purchase Agreement."

32.     Exhibit A to the Escrow Agreement set forth the Default Transaction Procedures. It provided that once the fiat cash and Bitcoin are in place, "the transaction commences through the atomic swap process," by which the "[Bitcoin] are transferred from the Seller's [Escrow

Company] account to the Buyer, while simultaneously, [t]he notional Fiat value is transferred from the Buyer's sub account at [the Escrow Company] to the Seller's Sub account at [the Escrow Company]."

33.    In this transaction, while the Market Making Company acted as the "seller" of the Bitcoin pursuant to the agreements, Customer-1 understood from the discussions leading up to the agreements that Thompson, the Escrow Company, and the Market Making Company were in fact selling Bitcoin that they would acquire from Seller-1. Customer-1 and Thompson had discussed how Customer-1 wanted to buy 1,000 Bitcoin per day from Seller-1 and other third-party sellers over the course of multiple transactions.

34.    According to the Default Transaction Procedures, the Escrow Company would receive cash and cryptocurrency into its respective escrow accounts for Customer-1 and the Market Making Company. The transaction would then be settled "through the atomic swap process." The Escrow Agreement does not indicate that currency may be transferred out of any party's escrow account, or out of the Escrow Company's control, into the accounts of third parties before the transaction is completed.

35.    In addition, the Escrow Agreement provides that the Escrow Company "may not assign or delegate its rights or obligations hereunder without the prior written consent of the Parties, which may be withheld in the Parties [sic] sole discretion."

36.    On or about June 28, 2018, Thompson emailed the Customer-1 Trader an order form for a 100 Bitcoin test purchase by Customer-1. The purpose of the test purchase was to confirm that the process of buying Bitcoin through the Escrow Company worked as expected before engaging in transactions of 1,000 Bitcoin per day. The Customer-1 Trader later emailed an executed version of the order form to Thompson.

37.     On or about June 28, 2018, Customer-1 wired $650,000 to the Escrow Bank Account in order to fund the purchase of 100 Bitcoin.

38.     On or about June 28, 2018, Thompson and the Customer-1 Trader exchanged text messages about the transaction.  At approximately 3:46 pm, the Customer-1 Trader texted Thompson:  "On for 5 [pm]?"  Thompson responded:  "Am tomorrow.  Just wrapping up paper on it and have these folks for the larger bits.  One of you [sic] primary sellers stepped up to do it in the am for you in advance of the larger tranches.  So you are bundled for am execution." Thompson later sent a text message: "They [the sellers] are loading coin overnight.  I will not run the transaction until I have coin in hand."  (Emphasis added).

39.     On or about Friday, June 29, 2018—the morning of the scheduled test— Thompson and the Customer-1 Trader exchanged Telegram messages about the transaction. Although Thompson had previously represented that the transaction would take place in the morning, Thompson suggested in the Telegram messages that he could not complete the transaction in the morning, but that the "2 o'clock slot [was] wide open."

40.     Later that same day, Thompson and the Customer-1 Trader exchanged text messages about the transaction.  When the Customer-1 Trader asked if they were executing the trade at 2 pm, Thompson replied, "Not at discount.  Getting folks to load an unplanned 100 coins at the poo [sic] price today is really difficult.  100 is committed on the order for Monday [July 2]."

41.     Also on or about June 29, 2018, the Customer-1 Trader emailed Thompson to ask, in sum and substance, for an account statement for the funds sent by Customer-1 to be held in escrow.

42.     On or about July 1, 2018, Thompson emailed the Customer-1 Trader and attached a "Portfolio Status Report." According to the Portfolio Status Report, Customer-1's account contained, as of June 30, 2018, the $650,000 that Customer-1 had sent to the Escrow Bank Account. In reality, as of June 30, 2018, the Escrow Bank Account into which Customer-1 had wired $650,000 had a balance of only $636,380.19. In fact, approximately $14,000 of Customer-1's funds were transferred out of the Escrow Bank Account to third parties for a use other than executing the 100 Bitcoin transaction and Thompson did not disclose this information to Customer-1.

43.     The Escrow Bank Account was not used by Thompson solely for Customer-1's funds; rather, Thompson engaged in multiple other deposits and transfers/withdrawals using the Escrow Bank Account. As of June 27, 2018, the Escrow Bank Account held approximately $15,402.53. On June 28 and 29, 2018, in addition to the $650,000 received from Customer-1, funds from other sources were transferred into the account totaling approximately $231,954.16 and several transfers were made out of the account totaling approximately $260,977.20. In particular, on June 29, 2018, while holding Customer-1's money in custody for the intended Bitcoin transaction, Thompson transferred $20,000 from the Escrow Bank Account to an account in the name of another company he was affiliated with ("Account 2"), from which the money was then wired to a bank account of a separate company ("Company A").

44.     On or about July 2, 2018, Thompson and the Customer-1 Trader exchanged text messages about the 100 Bitcoin transaction, which had still not been completed. In one of the messages, Thompson stated that the transaction had not gone through because the "[p]rice is high and other party does not have enough cash." Thompson was claiming that another Bitcoin buyer with whom Thompson had planned to bundle Customer-1's order for 100 Bitcoin in order to

purchase a larger amount of Bitcoin at a discounted price did not have enough cash to complete

their part of the purchase.

45.     Also on July 2, 2018, the Customer-1 Trader participated in a phone call with

Thompson and Individual-1.  The Customer-1 Trader was in New York, New York, near

Customer-1's offices, during the call.  Thompson and Individual-1 told the Customer-1 Trader

on the call that the Bitcoin transaction needed to involve a minimum of 500 Bitcoins.  Thompson

also told the Customer-1 Trader that Thompson had the Bitcoin in hand.

46.     Later on or about July 2, 2018, the Customer-1 Trader and Thompson exchanged

additional text messages about the 500 Bitcoin transaction (the Customer-1 Trader is referred to

as "Trader"):

| Trader: | I don't get why the seller won't accommodate a 100 lot |
|---|---|
| Trader: | As a test |
| Thompson: | on with folks to get backup...will call you in 15 |
| Trader: | Hey you have the coin in hand right? |
| Trader: | I will send you the cash for 500 [Bitcoin] |
| Trader: | I want the trade today |
| Thompson: | Ok. Yes |
| Thompson: | Ok |
| Thompson: | Will start liking it up |
| Thompson: | Lining |
| Thompson: | Aka kicking the other guy out [smiley face emoji] |
| Thompson: | I am unlikely to get it over today though because I have to move money off of exchanges |
| Thompson: | And that could take time |

15

| Trader: | Still Chase for the 400 lot guy concurrently |
|---------|-----------------------------------------------|
| Thompson: | Ok.  Understood Ok.  Will line it up for tomorrow |

47.     In this conversation, the Customer-1 Trader offered to buy the remaining 400 Bitcoin himself to help solve Thompson's purported difficulty arranging for another buyer of the remaining 400 Bitcoin.  The Customer-1 Trader asked that Thompson continue pursuing his other purported buyer to see if the other person could buy the 400 Bitcoin while the Customer-1 Trader obtained the money to fulfill the entire order.

48.     Thompson's representation that he and/or the Escrow Company had the Bitcoin in hand on or about July 2, 2018, was false.  Thompson later admitted under oath in another proceeding that he understood the Bitcoin to be in the custody of a "sub-escrow agent" who was a lawyer in Florida.

49.     Based on Thompson's fraudulent representation that he and/or the Escrow Company had the 500 Bitcoin in hand and his fraudulent representation that he would keep custody of Customer-1's cash until there was an "atomic swap" of cash and Bitcoin, on or about July 3, 2018, at approximately 9:28 am, Customer-1 wired an additional $2.6 million into the Escrow Bank Account.  This transfer of $2.6 million on July 3, 2018, brought the total funds wired from Customer-1 to the Escrow Bank Account to $3.25 million.  The additional cash was to fund the purchase of the remaining 400 Bitcoin, for a total of 500 Bitcoin.

50.     Customer-1 would not have wired the $2.6 million if not for Thompson's false representations, including:  (1) his false representation that he and/or the Escrow Company had the 500 Bitcoin in hand, and (2) his false representations that he and/or the Escrow Company would not transfer Customer-1's money from the Escrow Bank Account unless Thompson and/or the Escrow Company had custody of the Bitcoin.

51.     On or about July 3, 2018, beginning at approximately 12:03 pm, the Customer-1 Trader and Thompson exchanged emails regarding the expected Bitcoin trade.  In particular, in one email, Thompson stated "[p]lease see the execution report on the transaction just completed," and then represented that Customer-1 had purchased 500 Bitcoins for a total price of $3,191,067.20.  In the same email, Thompson told the Customer-1 Trader that he was sending a test transaction to Customer-1's wallet.[1]

52.     On or about July 3, 2018, at 2:05 pm, the Customer-1 Trader sent Thompson an email confirming that Customer-1 had received the test transaction.  The Customer-1 Trader then asked Thompson to send the 500 Bitcoin.

53.     On or about July 3, 2018, at approximately 3:39 pm, the Customer-1 Trader sent Thompson a message requesting the Bitcoin "immediately."  At approximately 3:44 pm, Thompson sent the Customer-1 Trader an email that said:  "We had a white list issue between the two accounts we have internally and have to unlock the white list, which is what I was doing while you were calling.  [Wallet Custodian] is clearing and it will go out."  In this context, "white list" refers to a wallet holder pre-approving with a wallet custodian only certain recipient wallet addresses so that Bitcoin cannot inadvertently be sent from an owner's wallet to other, non-approved addresses.

54.     On or about July 3, 2018, the Customer-1 Trader sent additional emails to Thompson seeking an update on the status of the transaction.

55.     Thompson and/or the Escrow Company did not send the 500 Bitcoin to Customer-1's wallet on July 3, 2018, as promised.  Nor did Thompson and/or the Escrow Company maintain Company-1's cash in the Escrow Bank Account.  Rather, on or about July 3, 2018, the

---

[1] It is common for parties in cryptocurrency transactions to send the smallest unit of Bitcoin, 0.00000001 Bitcoin, before conducting a larger transaction to ensure that the sender entered the destination wallet address (a long string of letters and numbers) correctly and that the counterparty received the test amount

same day Customer-1 had wired $2.6 million to the Escrow Bank Account, Thompson wired approximately $3,090,250 from the Escrow Bank Account to a bank account held by a law firm in Florida.[2]

56.     Also on July 3, 2018, Thompson wired approximately $100,000 from the Escrow Bank Account to Account 2.  The $100,000 transferred to Account 2 was then wired to the bank account for Company A.

57.     On or about July 4, 2018, the Customer-1 Trader emailed Thompson to ask for a time frame for the delivery of the Bitcoin.  That same day, the Customer-1 Trader and Thompson engaged in a text message conversation about the Bitcoin transaction.

58.     During the text message conversation, Thompson made several false representations regarding the status of the trade:

- "Issue should be solved, but getting someone into the back office now to get released just taking time since everybody's a few hours out, I have someone driving back to the office so that they can start the release.  Not sure what time they're ETA is."

- "[Two] party release is required.  It was fixed overnight."

- "I am making [name of employee] drive 3.5 hours back from camping with her fimily [sic] to put it in th [sic] system as she is the closest and on call for the day.  [Transaction will go through] when she is in."

59.     Customer-1 did not receive the 500 Bitcoin in its wallet on July 4, 2018, as promised by Thompson.

60.     On or about July 5, 2018, at approximately 7:42 am, the Customer-1 COO emailed Thompson to ask for an update on the transaction.  Shortly thereafter, Thompson responded that "it is set to clear in the morning batch."

---

[2] Between on or about June 28, 2018, when Customer-1 had sent approximately $650,000 to the Escrow Bank Account and July 3, 2018, when Customer-1 wired the additional $2.6 million to that account, the Escrow Bank Account received deposits from other entities.

61.     Beginning at approximately 9:29 am on July 5, 2018, Thompson and the Customer-1 Trader exchanged numerous text messages about the transaction.  In those messages, in sum and substance, the Customer-1 Trader repeatedly inquired about the status of the transaction and Thompson provided false reasons for the delay.  For example, at one point, Thompson stated, "I am on the phone fixing the wallet security item from Tuesday, it's a quick fix. . . .  Just need to reset."  In sworn testimony, Thompson admitted this statement was not accurate and that he was attempting to buy time.

62.     Customer-1 did not receive the 500 Bitcoin in its wallet on July 5, 2018, as promised by Thompson.

63.     From approximately July 6 to July 8, 2018, Thompson continued to represent to Customer-1 that the Bitcoin transaction would be completed.

64.     On or about July 9, 2018, Customer-1 demanded that Thompson return 50% of the $3.25 million that Customer-1 had wired to the Escrow Bank Account.  That same day, in a text message to the Customer-1 Trader, Thompson represented that Customer-1 would receive the money back "this afternoon."  No money was returned to Customer-1 that day.

65.     On or about July 10, 2018, Thompson emailed the Customer-1 Trader and stated: "[First name of the Customer-1 Trader] as I indicated around 1 pm you will get the wire today as soon as we process the items we discussed."

66.     The $3.25 million that Customer-1 sent to the Escrow Bank Account in total was never returned to Customer-1, nor did Customer-1 ever receive the 500 Bitcoin it purchased.[3]

## C.     Fraud Involving Customer 2

67.     In or about July 2018, Thompson induced Customer-2, after knowingly or recklessly making false representations, to send to the Escrow Company over $4 million to fund

---

[3] Customer-1 did not receive any Bitcoin from Volantis other than the 0.00000001 that had been sent as a test.

the purchase of Bitcoin.  After receiving Customer-2's money, Thompson sent virtually all of the money to a third party without first receiving any Bitcoin in return.  Customer-2 was never provided with any Bitcoin, nor was any money returned to Customer-2.  Thompson also lied to Customer-2 about the location of the Bitcoin and the reasons the transaction was not completed.

68.     Customer-2 is a business based in Ireland that trades cryptocurrency.

69.     In or about March 2018, the Chief Executive Office of Customer-2 (the "Customer-2 CEO") spoke with Thompson by phone.  During that first call, Thompson provided a high-level overview of how the Escrow Company operated as an escrow agent to eliminate counterparty risk in cryptocurrency transactions.

70.     On or about May 24, 2018, Thompson emailed the Customer-2 CEO documents that provided an overview of the Escrow Company.  The overview documents represented that the Escrow Company "provides a global framework of accounts and transaction facilitation infrastructure that minimizes settlement default risk and delays regulatory complexity." (Emphasis added).  The overview documents further represented that it "holds assets in escrow within segmented customer accounts" (emphasis added), and that because the Escrow Company is "asset custodian for the both sides of the transaction, there is no risk of default" (emphasis added).  Finally, the overview documents noted that transactions "are pre-funded and typically settle in real-time."

71.     The overview documents also stated, "As part of the [Escrow Company's] service, compliance is integrated into everything we do," and represented that "[c]ounterparty risk management and compliance-related activities" (emphasis added) are provided.

72.     In or about July 2018, the Customer-2 CEO and Thompson began negotiating a Bitcoin transaction for which the Escrow Company would act as an escrow agent.  On or about

July 14, 2018, Thompson told the Customer-2 CEO that he had two sellers available and that he was loading the sellers' Bitcoin onto his platform.

73.     On or about July 20, 2018, Customer-2 and the Escrow Company entered into an Escrow Services Agreement (the "Customer-2 Escrow Agreement"), under which Customer-2 engaged the Escrow Company to hold and disburse assets for Customer-2 at Customer-2's direction.  The Customer-2 Escrow Agreement provided that the Escrow Company would receive a one-time escrow fee of 1.5% of each asset deposited with the Escrow Company, plus additional monthly fees at a minimum of $2,500.  Thompson signed the Customer-2 Escrow Agreement on behalf of the Escrow Company as Managing Member.

74.     The Customer-2 Escrow Agreement does not indicate that cash may be transferred out of any party's escrow account into the accounts of third parties before a transaction is completed.  It expressly provides that the Escrow Company "may not assign or delegate its rights or obligations hereunder without the prior written consent of Customer, which may be withheld in Customer's sole discretion."

75.     On or about July 23, 2018, Thompson emailed the Customer-2 CEO and Customer-2's Chief Operating Officer a welcome package outlining the way orders are processed by the Escrow Company.  The welcome package included wire instructions, which stated that funds were to be wired through a bank account in New York, New York.

76.     On or about July 23, 2018, Thompson and the Customer-2 CEO discussed the transaction over the phone.  Thompson reassured the Customer-2 CEO, in sum and substance, that he and/or the Escrow Company had the seller's Bitcoin.  The Customer-2 CEO had made clear to Thompson in prior conversations that Customer-2 would transact with the Escrow

Company only if the Bitcoin was in the Escrow Company's possession, and Thompson agreed to this arrangement.

77.     Separately, on or about July 23, 2018, Thompson emailed a cryptocurrency broker ("Broker") to discuss a transaction involving the purchase of Bitcoin from another company ("Seller-2"). Thompson's email outlined the process for his planned purchase of the Bitcoin from Seller-2. Thompson's email stated that the Escrow Company would transfer the funds (i.e., what ultimately were Customer-2's funds) to purchase the Bitcoin to a third-party escrow (the "Third-Party Escrow") before the Third-Party Escrow would send the Bitcoin to the Escrow Company on behalf of Seller-2. Thompson's plan to buy Bitcoin (for Customer-2) by sending Customer-2's funds to a Third-Party Escrow before the Third-Party Escrow provided Seller-2's Bitcoin to the Escrow Company was directly contrary to Thompson's assurances to Customer-2 that its funds would not be transferred until the Bitcoin was in the control of the Escrow Company.

78.     On or about July 24, 2018, Thompson and Seller-2 entered into a contract for the Escrow Company to purchase Bitcoin from Seller-2 (the "Sales Contract"). Under the Sales Contract, the Escrow Company agreed to purchase tranches of Bitcoin from Seller-2 on a weekly basis, at a 6% discount. The Sales Contract provided that the first tranche would be for 500 Bitcoin, with additional tranches to be decided one week in advance. The Sales Contract provided that all payments from the Escrow Company for the Bitcoin were to be paid out of a bank account in New York, New York. An appendix to the Sales Contract provided that the Third-Party Escrow would act as an escrow agent for the transactions.

79.     On or about July 23, 2018, the Customer 2 CEO also asked Thompson to demonstrate that he possessed the Bitcoin that Customer-2 intended to buy. On or about July 24,

2018, Thompson provided the Customer-2 CEO with a wallet address for the source of Bitcoin controlled by the seller that Thompson claimed would be the "root of the fill" for the Bitcoin that Customer-2 was agreeing to purchase.  Thompson attached a report for the wallet address that showed the wallet contained over 10,000 Bitcoin at that time.  Thompson did not inform the Customer-2 CEO in that e-mail that he would transfer the money from Customer-2 to a third party before the Bitcoin would be in Thompson's control.

80.     Also on or about July 24, 2018, Thompson emailed the Customer-2 COO with a block order form for Bitcoin transactions.  The block order form provided that the order would be for the purchase of up to 6,600 Bitcoin, on a schedule of 500 Bitcoin a day for the week of July 23rd, and 1,000 Bitcoin per day for the week of July 30th.  The order form—unlike the similar order form Thompson had provided to Customer-1 in June 2018 and which had resulted in an arbitration proceeding filed against Thompson days prior, on July 17, 2018—further provided that the transaction was a "multi-escrow execution managed by [the Escrow Company]. All processes fit within the process structure outlined above."  The order form provided, among other things, that the Escrow Company "validates Fiat Capital and Coin for daily tranche as ready-by 7 am ET."  The order form did not explain the term "multi-escrow execution managed by [the Escrow Company]," nor did it state that any money would be transferred out of the escrow account where Customer-2's funds were being held before the Escrow Company or Customer-2 received any Bitcoin.

81.     Based on Thompson's representations to Customer-2 that he and/or the Escrow Company would hold the funds until Thompson and/or the Escrow company had control of the Bitcoin being purchased, on or about July 24, 2018, Customer-2 executed the block purchase

order and wired €3.6 million from a bank in Europe to the Escrow Bank Account in New York.

These funds were received on or about July 25, 2018.

82.     On or about July 26, 2018, over the course of the day, the Customer-2 CEO and

Thompson exchanged the following text messages about the order:

| Thompson: | [Name of CEO], Please call.  Back office just called and we have a few hour delay in execution this am due to seller availability I need to know how to handle (kill/delay/execute). Please call. |
| Customer-2 CEO: | Feel like killing my [sic] myself . . . [smiley face emoji].  Give me a min I had just started to move to make the trades. |
| Thompson: | This is why I reaching out as soon as we  had the alert at 5:30 |
| Customer-2 CEO: | Hi mate, any update on timing? |
| Thompson: | I'll call you right back |
| Customer-2 CEO: | Getting late and I'm getting really [sad face emoji] |
| Thompson: | Me too.  I am hammering them now |
| Customer-2 CEO: | Please tell the seller to sort this.  We trade tomorrow or I'm more than likely going to pull away from this seller.  Realize other sellers with you and we can discuss but messy so far |
| Thompson: | Yes.  I went there 45 minutes ago |
| Customer-2 CEO: | Barry, I will be in bed next 30–40 mins. Any update on timing? |

83.     On or about July 27, 2018, the Customer-2 CEO emailed Thompson to confirm

that Customer-2 had accepted a trade of 500 Bitcoin at the price of €6,607 per Bitcoin.  The

Customer-2 CEO's email further noted that Customer-2 had wired €3.6 million into the Escrow

Bank Account, so, at that price per Bitcoin, its balance would be €296,500.50 after the trade.

Later that same day, the Customer-2 CEO emailed Thompson, stating, among other things,

"Address has been reconfirmed via Telegram, including QR."  Thompson responded to the Customer-2 CEO and stated "Updated wallet address received."

84.     On or about July 27, 2018, three days after receiving Customer-2's funds, without receiving any Bitcoin from the Third-Party Escrow or Seller-2, Thompson converted €3.5 million of Customer-2's €3.6 million into U.S. dollars ($4,066,107.50) and then wired approximately $4,024,914.56 from the Escrow Bank Account to an account held by the Third-Party Escrow.

85.     Customer-2 did not receive the 500 Bitcoin on July 27, 2018, as Thompson promised.

86.     Beginning on or about July 27, 2018, the Customer-2 CEO and Thompson exchanged numerous text messages about the status of the order.  In those text messages, Thompson falsely represented, in sum and substance, that he would be able to release the Bitcoin to Customer-2 once a wire transfer made it to the counterparty's account.  In one message, Thompson stated, "I'm just finding out if they received the wire.  Then I can release."  In another text message on or about July 28, 2018, Thompson continued making false statements to the Customer-2 CEO about the status of the transaction.  Thompson stated that he was "working the seller outside the escrow [to] force release" and that "worst case" he would go to the executives of the mining groups[4] so they could "override everybody and authorize me to release."

87.     On July 30, 2018, Thompson falsely stated in a message to the Customer-2 CEO: "Just got text the key fragments in to start moving to the hot wallet so we can move out of [Wallet Custodian].  Going to be a few minutes yet (40 is worst case)."

---

[4] Bitcoin mining is the process of verifying transactions that are added to the Bitcoin blockchain, for which the miner receives newly-created Bitcoin.

88.     Thompson's statements to Customer-2 CEO were false, because neither he nor the Escrow Company had possession of the Bitcoin at the time, nor did either of them have the ability to release the Bitcoin to Customer-2.

89.     In multiple emails among Thompson and representatives of Seller-2 between on or about July 27 and August 6, 2018, Thompson asked Seller-2 to transfer the Bitcoin to a wallet under Thompson's control.  Rather than merely seeking authorization to release the Bitcoins to Customer-2, in emails on July 28 and July 30, 2018, Thompson asked the seller for "a timeline of coin fill," and complained that the "deadline on delivery of Coin" had passed.

90.     In sworn testimony in a civil proceeding in or about October 2018, Thompson testified, contrary to his statements to the Customer-2 CEO that he would be able to release the coins, that the Bitcoin never came and that while the counterparty was "to this day" telling Thompson they would "deliver coin," he did not believe it.

91.     Customer-2 had not received any Bitcoin by July 31, 2018.  On that day, the Customer-2 CEO emailed Thompson to ask that Thompson either engage in discussions or return the €3.6 million immediately.  No money was returned to Customer-2 that day.

92.     In fact, days later, on or about August 8, 2018, Thompson converted the remaining €100,000 of Customer-2's money to U.S. dollars (worth $115,620.80) and, rather than returning it to Customer-2, transferred $100,000 to Account 2.  Just as he had done with Customer-1's money, Thompson then wired the $100,000 from Account 2 to account in the name of Company A.

93.     The Bitcoin transaction between Customer-2 and the Escrow Company was never completed.  Customer-2 never received any Bitcoin and none of the €3.6 million sent by Customer-2 was returned to Customer-2.

## CLAIMS FOR RELIEF FOR VIOLATIONS OF THE
## COMMODITY EXCHANGE ACT AND REGULATIONS

### Count I—Fraud by Deceptive Device or Contrivance
### Violations of Section 6(c)(1) of the Act and Regulation 180.1(a)

94.     Paragraphs 1 through 93 are re-alleged and incorporated herein by reference.

95.     Section 6(c)(1) of the Act, 7 U.S.C. § 9(1) (2012), makes it unlawful for any person, directly or indirectly, to:

> use or employ, or attempt to use or employ, in connection with any swap, or a contract of sale of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity, any manipulative or deceptive device or contrivance, in contravention of such rules and regulations as the Commission shall promulgate by not later than 1 year after [July 21, 2010, the date of enactment of the Dodd-Frank Wall Street Reform and Consumer Protection Act] . . . .

96.     Regulation 180.1(a), 17 C.F.R. § 180.1(a) (2019), provides:

> It shall be unlawful for any person, directly or indirectly, in connection with any swap, or contract of sale of any commodity in interstate commerce, or contract for future delivery on or subject to the rules of any registered entity, to intentionally or recklessly:
>
> (1) Use or employ, or attempt to use or employ, any manipulative device, scheme, or artifice to defraud;
>
> (2) Make, or attempt to make, any untrue or misleading statement of a material fact or to omit to state a material fact necessary in order to make the statements made not untrue or misleading;
>
> (3) Engage, or attempt to engage, in any act, practice, or course of business, which operates or would operate as a fraud or deceit upon any person . . . .

97.     During the Relevant Period, as described above, Thompson violated Section 6(c)(1) of the Act and Regulation 180.1(a) by, among other things, in connection with contracts of sale of commodities in interstate commerce, using or employing, or attempting to use or employ, a manipulative device, scheme, or artifice to defraud, making or attempting to

make untrue or misleading statements of material fact or omitting to state or attempting to omit

material facts necessary in order to make statements made not untrue or misleading, and

engaging or attempting to engage in a course of business operating as a fraud or deceit upon

Customer-1 and Customer-2 as follows:

A. Soliciting funds from the Customers through oral representations misrepresenting the services provided by the Escrow Company by stating, among other things, that it acted as an escrow service and, under its process, the Escrow Company would have control over both the cash from the customer intending to purchase Bitcoin and the Bitcoin from the respective seller and would make an "atomic swap," i.e. a simultaneous exchange, when, in fact, Thompson, on behalf of the Escrow Company transferred Customer-1 and Customer-2's funds to a third-party without having the Bitcoin and making a simultaneous exchange;

B. Soliciting Customer-1 and Customer-2 through oral representations falsely representing that the use of the Escrow Company eliminated the risk of settlement failure when, in fact, the Escrow Company transferred each Customer's funds to a third party without having control over the Bitcoin being purchased, thus creating the risk that the Customer's funds would be taken without a corresponding transfer of Bitcoin, which did ultimately occur;

C. Issuing a written Portfolio Status Report to Customer-1, misleadingly suggesting that Customer-1's funds had been kept safeguarded when, in fact, approximately $14,000 of Customer-1's funds had already been transferred to third parties for a use other than executing Customer-1's Bitcoin transaction;

D. Issuing written materials to Customer-1 and Customer-2 that provided an overview of the Escrow Company's service falsely stating that that there is no risk of default for the assets it holds in escrow and that the Escrow Company protects customers against counterparty risk when, in fact, the Escrow Company transferred each Customer's funds to a third party without having control over the Bitcoin being purchased, thus creating the risk that the Customer's purchase would not be completed, which did ultimately occur;

E. Making false written and oral statements as to the reasons Customer-1 had not received its Bitcoin; and

F. Taking portions of the funds that Customer-1 and Customer-2 had sent to the Escrow Company for the sole purpose of purchasing Bitcoin and transferring that money to other accounts for a purpose other than the purchase of Bitcoin and concealing from the Customers that their funds had been transferred for unauthorized purposes.

98.     Thompson engaged in the acts and practices described above intentionally or recklessly.

99.     By this conduct, Thompson violated Section 6(c)(1) of the Act and Regulation 180.1(a).

100.    Each act of:  (1) using or employing, or attempting to use or employ, a manipulative device, scheme, or artifice to defraud; (2) making, or attempting to make, untrue or misleading statements of material fact, or omitting to state material facts necessary to make the statements not untrue or misleading; and (3) engaging, or attempting to engage, in any act, practice, or course of business, which operated or would operate as a fraud or deceit upon any person, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of Section 6(c)(1) of the Act and Regulation 180.1.

## V.     RELIEF REQUESTED

**WHEREFORE**, the Commission respectfully requests that the Court, as authorized by Section 6c of the Act, 7 U.S.C. § 13a-1 (2012), and pursuant to its own equitable powers, enter:

A.      An order finding that Defendant violated Section 6(c)(1) of the Act, 7 U.S.C. § 9(1) (2012), and Regulation 180.1(a), 17 C.F.R. § 180.1(a) (2019);

B.      An order of permanent injunction enjoining Defendant and any other person or entity associated with him, including but not limited to affiliates, agents, servants, employees, assigns, attorneys, and all persons in active concert or participation with Defendant, including any successor thereof, from:

   i.      Engaging, directly or indirectly, in conduct in violation of Section 6(c)(1) of the Act or Regulation 180.1(a);

   ii.     Trading on or subject to the rules of any registered entity (as that term is defined in Section 1a(40) of the Act, 7 U.S.C. § 1a(40) (2012));

iii.    Entering into any transactions involving "commodity interests" (as that term is defined in Regulation 1.3, 17 C.F.R. § 1.3 (2019)), for his own personal account(s) or for any account in which Defendant has a direct or indirect interest;

iv.    Having any commodity interests traded on Defendant's behalf;

v.    Controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity interests;

vi.    Soliciting, receiving, or accepting any funds from any person for the purpose of purchasing or selling any commodity interests;

vii.    Applying for registration or claiming exemption from registration with the Commission in any capacity, and engaging in any activity requiring such registration or exemption from registration with the Commission, except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2019); and/or

viii.    Acting as a principal (as that term is defined in Regulation 3.1(a), 17 C.F.R. § 3.1(a) (2019)), agent, or any other officer or employee of any person (as that term is defined in Section 1a(38) of the Act, 7 U.S.C. § 1a(38) (2012)), registered, exempted from registration, or required to be registered with the Commission except as provided for in Regulation 4.14(a)(9));

C.    An order requiring Defendant to pay civil monetary penalties of not more than the civil monetary penalty prescribed by Section 6c(d)(1) of the Act, 7 U.S.C. § 13a-

1(d)(1) (2012), as adjusted for inflation pursuant to the Federal Civil Penalties

Inflation Adjustment Act Improvements Act of 2015, Pub. L. 114–74, 129 Stat.

584 (2015), title VII, Section 701, *see* Commission Regulation 143.8, 17 C.F.R.

§ 143.8 (2019), for each violation of the Act or Regulations, plus post-judgment

interest;

D.     An order directing Defendant, as well as any successors thereof, to disgorge,

pursuant to such procedure as the Court may order, all benefits received

including, but not limited to, trading profits, revenues, salaries, commissions,

fees, or loans derived directly or indirectly from acts or practices which constitute

violations of the Act and Regulations, as described herein, and pre- and post-

judgment interest thereon from the date of such violations;

E.     An order directing Defendant, as well as any successors thereof, to make full

restitution, pursuant to such procedure as the Court may order, to every customer

and investor whose funds Defendant received, or caused another person or entity

to receive, as a result of the acts and practices constituting violations of the Act

and Regulations, as described herein, and pre- and post-judgment interest thereon

from the date of such violations;

F.     An order directing Defendant, as well as any successors thereof, to rescind,

pursuant to such procedure as the Court may order, all contracts and agreements,

whether express or implied, entered into between, with, or among Defendant and

any customer or investor whose funds were received by Defendant as a result of

the acts and practices which constituted violations of the Act and the Regulations,

as described herein;

31

G.    An order directing that Defendant, and any successors thereof, makes an accounting to the Court of all of their assets and liabilities, together with all funds he received from and paid to investors and other persons in connection with commodity transactions and all disbursements for any purpose whatsoever of funds received from commodity transactions, including salaries, commissions, interest, fees, loans, and other disbursement of money or property of any kind from at least the beginning of the Relevant Period to the date of such accounting;

H.    An order requiring Defendant and any successors thereof to pay costs and fees as permitted by 28 U.S.C. §§ 1920 and 2412(a)(2) (2012); and

I.    An order providing such other and further relief as the Court deems proper.

## VI.    <u>DEMAND FOR JURY TRIAL</u>

Plaintiff hereby demands a jury trial.


Dated:  September 30, 2019

**COMMODITY FUTURES TRADING COMMISSION**

By: S/   David Oakland
David Oakland
Senior Trial Attorney
doakland@cftc.gov
Phone: (646) 746-9700

Lara Turcik
Senior Trial Attorney
lturcik@cftc.gov
Phone: (646) 746-9700

Peter Janowski
Trial Attorney
pjanowski@cftc.gov
Phone: (646) 746-9700

Steven Ringer
Chief Trial Attorney
sringer@cftc.gov
Phone: (646) 746-9700

Manal M. Sultan
Deputy Director
msultan@cftc.gov
Phone: (646) 746-9700

Commodity Futures Trading Commission
Division of Enforcement
140 Broadway, 19th Floor
New York, NY 10005
Phone: (646) 746-9700
Fax: (646) 746-9940

ATTORNEYS FOR PLAINTIFF
COMMODITY FUTURES TRADING
COMMISSION