UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

COMMODITY FUTURES TRADING
COMMISSION,

               Plaintiff,

    v.

JON BARRY THOMPSON,

           Defendant.

ECF Case No. 19-CV-9052

## CONSENT ORDER FOR PERMANENT INJUNCTION AND OTHER EQUITABLE RELIEF AGAINST DEFENDANT JON BARRY THOMPSON

## I.    INTRODUCTION

On September 30, 2019, Plaintiff Commodity Futures Trading Commission ("Commission" or "CFTC") filed a Complaint against Defendant Jon Barry Thompson ("Thompson" or "Defendant") seeking injunctive and other equitable relief, as well as the imposition of civil penalties, for violations of the Commodity Exchange Act ("Act"), 7 U.S.C. §§ 1–26 (2018), and the Commission's Regulations ("Regulations") promulgated thereunder, 17 C.F.R. pts. 1–190 (2019), specifically Section 6(c)(1) of the Act, 7 U.S.C. § 9(1) (2018), and Regulation 180.1(a), 17 C.F.R. § 180.1(a) (2019).

## II.    CONSENTS AND AGREEMENTS

To effect settlement of all charges alleged in the Complaint against Defendant without a trial on the merits or any further judicial proceedings, Defendant:

1.    Consents to the entry of this Consent Order for Permanent Injunction and Other Equitable Relief Against Defendant Jon Barry Thompson ("Consent Order");

2.     Affirms that he has read and agreed to this Consent Order voluntarily, and that no promise, other than as specifically contained herein, or threat, has been made by the Commission or any member, officer, agent, or representative thereof, or by any other person, to induce consent to this Consent Order;

3.     Acknowledges service of the summons and Complaint;

4.     Admits the jurisdiction of this Court over him and the subject matter of this action pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1 (2018);

5.     Admits the jurisdiction of the Commission over the conduct and transactions at issue in this action pursuant to the Act;

6.     Admits that venue properly lies with this Court pursuant to 7 U.S.C. § 13a-1(e);

7.     Waives:

a.     Any and all claims that he may possess under the Equal Access to Justice Act, 5 U.S.C. § 504 (2018) and 28 U.S.C. § 2412 (2018), and/or the rules promulgated by the Commission in conformity therewith, Part 148 of the Regulations, 17 C.F.R. pt. 148 (2019), relating to, or arising from, this action;

b.     Any and all claims that he may possess under the Small Business Regulatory Enforcement Fairness Act of 1996, Pub. L. No. 104-121, tit. II, §§ 201–53, 110 Stat. 847, 857–74 (codified as amended at 28 U.S.C. § 2412 and in scattered sections of 5 U.S.C. and 15 U.S.C.), relating to, or arising from, this action;

      c.      Any claim of Double Jeopardy based upon the institution of this action or the entry in this action of any order imposing a civil monetary penalty or any other relief, including this Consent Order; and

      d.      Any and all rights of appeal from this action;

8.      Consents to the continued jurisdiction of this Court over him for the purpose of implementing and enforcing the terms and conditions of this Consent Order and for any other purpose relevant to this action, even if Defendant now or in the future resides outside the jurisdiction of this Court;

9.      Agrees that he will not oppose enforcement of this Consent Order on the ground, if any exists, that it fails to comply with Rule 65(d) of the Federal Rules of Civil Procedure and hereby waives any objection based thereon;

10.      Agrees that neither he nor any of his agents or employees under his authority or control shall take any action or make any public statement denying, directly or indirectly, any allegation in the Complaint or the Findings of Fact or Conclusions of Law in this Consent Order, or creating or tending to create the impression that the Complaint and/or this Consent Order is without a factual basis; provided, however, that nothing in this provision shall affect his:  (a) testimonial obligations, or (b) right to take legal positions in other proceedings to which the Commission is not a party.  Defendant shall comply with this agreement, and shall undertake all steps necessary to ensure that all of his agents and/or employees under his authority or control understand and comply with this agreement;

11.      Consents to the entry of this Consent Order without admitting or denying the allegations of the Complaint or any findings or conclusions in this Consent Order, except as to jurisdiction and venue and except to the extent that any facts or conclusions are admitted by

Defendant in connection with the related criminal action concerning the same facts set forth herein, *United States v. Thompson*, 19-CR-00698 (S.D.N.Y filed July 18, 2019) (the "Criminal Action") ;

12.    Consents to the use of the findings and conclusions in this Consent Order in this proceeding and in any other proceeding brought by the Commission or to which the Commission is a party or claimant, agrees that they shall be taken as true and correct and be given preclusive effect therein, without further proof;

13.    Does not consent, however, to the use of this Consent Order, or the findings and conclusions herein, as the sole basis for any other proceeding brought by the Commission or to which the Commission is a party, other than a: statutory disqualification proceeding; proceeding in bankruptcy, or receivership; or proceeding to enforce the terms of this Consent Order;

14.    Agrees to provide immediate notice to this Court and the Commission by certified mail, in the manner required by paragraph 118 of Part VI of this Consent Order, of any bankruptcy proceeding filed by, on behalf of, or against him, whether inside or outside the United States; and

15.    Agrees that no provision of this Consent Order shall in any way limit or impair the ability of any other person or entity to seek any legal or equitable remedy against him in any other proceeding.

### III.    FINDINGS OF FACT AND CONCLUSIONS OF LAW

The Court, being fully advised in the premises, finds that there is good cause for the entry of this Consent Order and that there is no just reason for delay.  The Court therefore directs the entry of the following Findings of Fact, Conclusions of Law, permanent injunction and equitable relief pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1 (2018), as set forth herein.

**THE PARTIES AGREE AND THE COURT HEREBY FINDS:**

**A.    Findings of Fact**

**The Parties to this Consent Order**

16.    Plaintiff Commodity Futures Trading Commission is an independent federal regulatory agency that is charged by Congress with administering and enforcing the Act and the Regulations.

17.    Defendant Jon Barry Thompson is a resident of Easton, Pennsylvania. Thompson has never been registered with the Commission in any capacity.

### 1.    Background

18.    Bitcoin is a form of cryptocurrency (a type of digital asset), which is a decentralized, peer-to-peer form of electronic currency. Cryptocurrency is a digital representation of value that can be digitally traded and functions as: (1) a medium of exchange; (2) a unit of account; and/or (3) a store of value, but does not have legal tender status. Unlike "fiat currency," like the U.S. dollar and the Euro, cryptocurrency is not issued by any jurisdiction and functions only by agreement within the community of users of that particular currency.

19.    Cryptocurrencies like Bitcoin are held by their owners in electronic "wallets." These wallets have unique addresses, which are designated by a string of letters and numbers. Only an individual who possesses the unique "private key" associated with a wallet's address can access the cryptocurrency in that wallet. However, any individual can send cryptocurrency to any wallet. An individual does not have to submit any identifying information to any central authority to own a wallet, and therefore an individual can easily hold a wallet anonymously.

20.    A blockchain is a public, distributed electronic ledger. Whenever someone transfers cryptocurrency between wallet addresses, it is recorded on a blockchain. The

blockchain records only the movement of cryptocurrency between the addresses; it does not by itself identify the holders of the cryptocurrency. The blockchain primarily involved in this case is the Bitcoin blockchain.

21.     During the period from at least in or around June 2018 through at least August 2018 (the "Relevant Period"), Thompson and a company with which he was affiliated (the "Escrow Company") were engaged in the business of purchasing and selling Bitcoin, along with other forms of cryptocurrency, and the Escrow Company also acted as an escrow agent for third parties engaged in the purchase and sale of Bitcoin. As part of these operations, Thompson solicited and received fiat currency, including U.S. Dollars and Euros, from customers in various states and countries for the purpose of entering into or facilitating the Customer's purchase or sale of cryptocurrency.

### 2.  Defendant's Fraudulent Conduct

### a.  Fraud Involving Customer-1

22.     In or about June and July 2018, Thompson induced Customer-1 to send over $3 million to fund the purchase of Bitcoin after knowingly or recklessly making false representations to Customer-1 that he or the Escrow Company had the Bitcoin in hand and Customer-1's money could not be lost. After taking Customer-1's money and failing to provide any Bitcoin in return, Thompson lied for days about why the deal had not worked out, about the location of the Bitcoin that the Escrow Company was supposed to deliver to Customer-1, and about Customer-1's money, which was never returned.

23.     Customer-1 is a business engaged in, among other things, trading Bitcoin and other cryptocurrency. Throughout the Relevant Period, Customer-1 maintained offices in Jersey City, New Jersey, and New York, New York.

24.     In or about May 2018, the head cryptocurrency trader for Customer-1 (the "Customer-1 Trader") had a meeting at the office of an individual ("Individual-1") involved in cryptocurrency transactions.  During the meeting, Individual-1 told the Customer-1 Trader that he was the representative of a seller of Bitcoin ("Seller-1") and that Seller-1 wanted to use the Escrow Company as an intermediary to sell its Bitcoin, potentially to Customer-1.  Individual-1 did not disclose the identity of Seller-1 to the Customer-1 Trader.

25.     On or about June 14, 2018, Individual-1 set up a Telegram chat room for the Customer-1 Trader, Individual-1, and Thompson.  The Customer-1 Trader (on behalf of Customer-1), Thompson (on behalf of the Escrow Company), and Individual-1 (on behalf of Seller-1) then began negotiating the purchase of Bitcoin by Customer-1 from Seller-1 through the Escrow Company.

26.     From the beginning of the discussions, the participants in the chat room contemplated that the Bitcoin purchase would involve an escrow agreement.  For example, on or about June 14, 2018, Thompson emailed the Customer-1 Trader a draft escrow agreement.  In addition, that same day, the Customer-1 Trader sent Thompson and Individual-1 Telegram messages asking "Where is escrow held?" and "I assume fee is paid by seller?"  Individual-1 responded with the name of a financial institution and "yes, seller wil [sic] pay - just for you [first name of the Customer-1 Trader]."

27.     On or about June 20, 2018, Thompson participated in a conference call with the Customer-1 Trader, the Chief Operating Officer for Customer-1, and outside counsel for Customer-1.  At the time of the call, the Customer-1 Trader was in New York, New York.

28.     During this call, Thompson purported to explain to those acting on behalf of Customer-1 the service that he and the Escrow Company provided and gave them false

assurances that using the Escrow Company would eliminate any settlement risk (i.e., the risk that

the transaction would close without the Bitcoin at issue being transferred to Customer-1).

Thompson's false representations on the call included the following:

- "So we custody assets for folks that are trading, needing to trade, doing stuff, and then facilitate the trading.  So all we do is process one-sided orders that settle, right, and that way everybody who is a member of the network has full rights and there's no risk of settlement failure."  (Emphasis added).

- "In addition, when, umm, everything is [in] custody with me before the transaction commences, or it's a breach and the transaction can't start.  So cash is with me, coin is with me.  So the seller sends coin to me, the cash is with me . . . .  So the cash and coin are both within our control, and then when the transaction prices, we do an atomic swap."  (Emphasis added).

Thompson used the phrase "atomic swap" to mean instantaneously swapping the "cash and

coin" that was in his possession, i.e., transferring the Bitcoin to Customer-1 and the "cash" to

Seller-1.

29.     In addition, the parties to the call discussed a two-agreement structure, in which

Customer-1 would enter one agreement with the Escrow Company and another agreement with

another company with which Thompson was affiliated (the "Market Making Company").

Thompson proposed that the transaction would be conducted through Market Making Company

and the Escrow Company would serve as "a traditional escrow wrapper."

30.     On or about the following day, June 21, 2018, the Customer-1 Trader sent

Thompson a Telegram message attaching a draft master purchase agreement.  The Customer-1

Trader then asked Thompson via Telegram to send a draft escrow agreement.

31.     On or about June 21, 2018, the Customer-1 Trader sent an email to Thompson

that stated in part:  "Please send your escrow agreement."  That same day, Thompson replied to

the Customer-1 Trader with an email attaching a proposed escrow agreement.

8

32.     On or about June 22, 2018, Thompson sent the Customer-1 Trader a Telegram message regarding the draft master purchase agreement that stated: "[A representative of the Escrow Company] can send over. Changes are to make sure it complies with our process from the order. Cash and coin both in, in advance of transaction. Pricing, swap, then release." Thompson sent this message to Customer-1 Trader in order to have him believe that both Customer-1's cash and Seller-1's Bitcoin would be in Thompson's and/or the Escrow Company's control before the transaction commenced.

33.     On or about June 26 to 27, 2018, the Customer-1 Trader and Thompson exchanged Telegram messages about the escrow account where Customer-1's funds were to be held. During those messages, the Customer-1 Trader repeatedly asked for information on the security of the escrow account, and Thompson falsely assured the Customer-1 Trader that the Escrow Company would maintain control of the cash deposited by Customer-1, and that no one outside of the Escrow Company (except for the third-party wallet custodian service ("Wallet Custodian")) would have access to the wallet containing Seller-1's Bitcoin before it was released to Customer-1. Specifically, in response to Customer-1 Trader's question, seeking confirmation that "there is no point whereby the seller can call [Wallet Custodian] and ask for his coins to be moved," Thompson responded "Absolutely not. They have no legal standing to even engage or talk to [Wallet Custodian] in any way shape or form. If they have a login for authorization or other items related to that it's still under the [the Escrow Company's] command-and-control. Under no circumstances Shelly [sic] buyer or seller ever have the ability to impact the transaction or withdrawal assets without [the Escrow Company's] approval."

34.     Thompson reassured the Customer-1 Trader that Seller-1, whose identity was unknown to Customer-1, could not interfere with the transaction because the Escrow Company

9

exercised "command-and-control" over the Bitcoin stored in a wallet with Wallet Custodian. Thompson informed the Customer-1 Trader that Seller-1 had no "legal standing" to "engage or talk to [Wallet Custodian] in any way shape or form" and "only [the Escrow Company] had execution control over this transaction." Further, Thompson assured the Customer-1 Trader that the Escrow Company also controlled the cash that Customer-1 would send, so Customer-1 could simply ask for its money to be returned if Customer-1 decided not to trade before the transaction occurred.

35.     On or about June 27, 2018, Thompson emailed the Customer-1 Trader a welcome package with wire instructions. The wire instructions directed that funds to be transmitted by US Fedwire should pass through a specified bank in New York, for further credit to an account "c/o J. Barry Thompson" at the Escrow Financial Institution, also located in New York, New York (the "Escrow Bank Account"). Thompson was the only authorized signatory on the account.

36.     Among other things, the welcome package included flow charts to explain what happens to currency transferred into the Escrow Bank Account. The flow charts show that after the customer transfers money, the Escrow Company will confirm receipt and a formal audit trail will be issued showing the customer the current account balance. The flow charts also show that the customer must confirm amounts to be transferred from the Escrow Bank Account. The flow charts do not indicate that currency may be transferred to accounts of third parties without the customer's approval and without either the Escrow Company or the customer receiving the Bitcoin.

37.     On or about June 27, 2018, the Customer-1 Trader emailed Thompson an executed version of the Master Purchase Agreement (the "MPA") between Customer-1 and the Market Making Company. The MPA falsely represented that "[the Market Making Company] is

a limited liability company organized under the laws of the state of Delaware." The MPA was counter-executed by Thompson on behalf of the Market Making Company as its "Director, Escrow Transaction Coordination."

38. On or about June 28, 2018, Thompson emailed the Customer-1 Trader the counter-executed escrow agreement (the "Escrow Agreement"). Under the Escrow Agreement, the Market Making Company, as the immediate seller of the Bitcoin, and Customer-1, as the buyer, engaged the Escrow Company to hold and disburse assets in accordance with the terms and conditions of the MPA. The Escrow Company was to function as a "depository" to facilitate trades between the Market Making Company and Customer-1. The Escrow Agreement further provided that, as to escrow fees, "[t]he Parties are liable for the fees set forth in the Master Purchase Agreement."

39. Exhibit A to the Escrow Agreement set forth the Default Transaction Procedures. It provided that once the fiat cash and Bitcoin are in place, "the transaction commences through the atomic swap process," by which the "[Bitcoin] are transferred from the Seller's [Escrow Company] account to the Buyer, while simultaneously, [t]he notional Fiat value is transferred from the Buyer's sub account at [the Escrow Company] to the Seller's Sub account at [the Escrow Company]."

40. In this transaction, while the Market Making Company acted as the "seller" of the Bitcoin pursuant to the agreements, Customer-1 understood from the discussions leading up to the agreements that Thompson, the Escrow Company, and the Market Making Company were in fact selling Bitcoin that they would acquire from Seller-1. Customer-1 and Thompson had discussed how Customer-1 wanted to buy 1,000 Bitcoin per day from Seller-1 and other third-party sellers over the course of multiple transactions.

41.     According to the Default Transaction Procedures, the Escrow Company would receive cash and cryptocurrency into its respective escrow accounts for Customer-1 and the Market Making Company.  The transaction would then be settled "through the atomic swap process."  The Escrow Agreement does not indicate that currency may be transferred out of any party's escrow account, or out of the Escrow Company's control, into the accounts of third parties before the transaction is completed.

42.     In addition, the Escrow Agreement provides that the Escrow Company "may not assign or delegate its rights or obligations hereunder without the prior written consent of the Parties, which may be withheld in the Parties [sic] sole discretion."

43.     On or about June 28, 2018, Thompson emailed the Customer-1 Trader an order form for a 100 Bitcoin test purchase by Customer-1.  The purpose of the test purchase was to confirm that the process of buying Bitcoin through the Escrow Company worked as expected before engaging in transactions of 1,000 Bitcoin per day.  The Customer-1 Trader later emailed an executed version of the order form to Thompson.

44.     On or about June 28, 2018, Customer-1 wired $650,000 to the Escrow Bank Account in order to fund the purchase of 100 Bitcoin.

45.     On or about June 28, 2018, Thompson and the Customer-1 Trader exchanged text messages about the transaction.  At approximately 3:46 pm, the Customer-1 Trader texted Thompson:  "On for 5 [pm]?"  Thompson responded:  "Am tomorrow.  Just wrapping up paper on it and have these folks for the larger bits.  One of you [sic] primary sellers stepped up to do it in the am for you in advance of the larger tranches.  So you are bundled for am execution."  Thompson later sent a text message: "They [the sellers] are loading coin overnight.  I will not run the transaction until I have coin in hand."

46.     On or about Friday, June 29, 2018—the morning of the scheduled test—

Thompson and the Customer-1 Trader exchanged Telegram messages about the transaction.

Although Thompson had previously represented that the transaction would take place in the

morning, Thompson suggested in the Telegram messages that he could not complete the

transaction in the morning, but that the "2 o'clock slot [was] wide open."

47.     Later that same day, Thompson and the Customer-1 Trader exchanged text

messages about the transaction.  When the Customer-1 Trader asked if they were executing the

trade at 2 pm, Thompson replied, "Not at discount.  Getting folks to load an unplanned 100 coins

at the poo [sic] price today is really difficult.  100 is committed on the order for Monday [July

2]."

48.     Also on or about June 29, 2018, the Customer-1 Trader emailed Thompson to ask,

in sum and substance, for an account statement for the funds sent by Customer-1 to be held in

escrow.

49.     On or about July 1, 2018, Thompson emailed the Customer-1 Trader and attached

a "Portfolio Status Report."  According to the Portfolio Status Report, Customer-1's account

contained, as of June 30, 2018, the $650,000 that Customer-1 had sent to the Escrow Bank

Account.  In reality, as of June 30, 2018, the Escrow Bank Account into which Customer-1 had

wired $650,000 had a balance of only $636,380.19.  In fact, approximately $14,000 of Customer-

1's funds were transferred out of the Escrow Bank Account to third parties for a use other than

executing the 100 Bitcoin transaction and Thompson did not disclose this information to

Customer-1.

50.     The Escrow Bank Account was not used by Thompson solely for Customer-1's

funds; rather, Thompson engaged in multiple other deposits and transfers/withdrawals using the

Escrow Bank Account.  As of June 27, 2018, the Escrow Bank Account held approximately

$15,402.53.  On June 28 and 29, 2018, in addition to the $650,000 received from Customer-1,

funds from other sources were transferred into the account totaling approximately $231,954.16

and several transfers were made out of the account totaling approximately $260,977.20.  In

particular, on June 29, 2018, while holding Customer-1's money in custody for the intended

Bitcoin transaction, Thompson transferred $20,000 from the Escrow Bank Account to an account

in the name of another company he was affiliated with ("Account 2"), from which the money

was then wired to a bank account of a separate company ("Company A").

51.     On or about July 2, 2018, Thompson and the Customer-1 Trader exchanged text

messages about the 100 Bitcoin transaction, which had still not been completed.  In one of the

messages, Thompson stated that the transaction had not gone through because the "[p]rice is high

and other party does not have enough cash."  Thompson was claiming that another Bitcoin buyer

with whom Thompson had planned to bundle Customer-1's order for 100 Bitcoin in order to

purchase a larger amount of Bitcoin at a discounted price did not have enough cash to complete

their part of the purchase.

52.     Also on July 2, 2018, the Customer-1 Trader participated in a phone call with

Thompson and Individual-1.  The Customer-1 Trader was in New York, New York, near

Customer-1's offices, during the call.  Thompson and Individual-1 told the Customer-1 Trader

on the call that the Bitcoin transaction needed to involve a minimum of 500 Bitcoins.  Thompson

also told the Customer-1 Trader that Thompson had the Bitcoin in hand.

53.     Later on or about July 2, 2018, the Customer-1 Trader and Thompson exchanged

additional text messages about the 500 Bitcoin transaction.  In this conversation, the Customer-1

Trader offered to buy the remaining 400 Bitcoin himself to help solve Thompson's purported

14

difficulty arranging for another buyer of the remaining 400 Bitcoin.  The Customer-1 Trader texted Thompson "Hey you have the coin in hand right?  I will send you the cash for 500 [Bitcoin] I want the trade today."  Thompson replied "Ok. Yes. Ok."

54.    The Customer-1 Trader asked that Thompson continue pursuing his other purported buyer to see if the other person could buy the 400 Bitcoin while the Customer-1 Trader obtained the money to fulfill the entire order.

55.    Thompson's representation that he and/or the Escrow Company had the Bitcoin in hand on or about July 2, 2018, was false.  Thompson later admitted under oath in another proceeding that he understood the Bitcoin to be in the custody of a "sub-escrow agent" who was a lawyer in Florida.

56.    Based on Thompson's fraudulent representation that he and/or the Escrow Company had the 500 Bitcoin in hand and his fraudulent representation that he would keep custody of Customer-1's cash until there was an "atomic swap" of cash and Bitcoin, on or about July 3, 2018, at approximately 9:28 am, Customer-1 wired an additional $2.6 million into the Escrow Bank Account.  This transfer of $2.6 million on July 3, 2018, brought the total funds wired from Customer-1 to the Escrow Bank Account to $3.25 million.  The additional cash was to fund the purchase of the remaining 400 Bitcoin, for a total of 500 Bitcoin.

57.    Customer-1 would not have wired the $2.6 million if not for Thompson's false representations, including:  (1) his false representation that he and/or the Escrow Company had the 500 Bitcoin in hand, and (2) his false representations that he and/or the Escrow Company would not transfer Customer-1's money from the Escrow Bank Account unless Thompson and/or the Escrow Company had custody of the Bitcoin.

58.     On or about July 3, 2018, beginning at approximately 12:03 pm, the Customer-1 Trader and Thompson exchanged emails regarding the expected Bitcoin trade.  In particular, in one email, Thompson stated "[p]lease see the execution report on the transaction just completed," and then represented that Customer-1 had purchased 500 Bitcoins for a total price of $3,191,067.20.  In the same email, Thompson told the Customer-1 Trader that he was sending a test transaction to Customer-1's wallet.[1]

59.     On or about July 3, 2018, at 2:05 pm, the Customer-1 Trader sent Thompson an email confirming that Customer-1 had received the test transaction.  The Customer-1 Trader then asked Thompson to send the 500 Bitcoin.

60.     On or about July 3, 2018, at approximately 3:39 pm, the Customer-1 Trader sent Thompson a message requesting the Bitcoin "immediately."  At approximately 3:44 pm, Thompson sent the Customer-1 Trader an email that said:  "We had a white list issue between the two accounts we have internally and have to unlock the white list, which is what I was doing while you were calling.  [Wallet Custodian] is clearing and it will go out."  In this context, "white list" refers to a wallet holder pre-approving with a wallet custodian only certain recipient wallet addresses so that Bitcoin cannot inadvertently be sent from an owner's wallet to other, non-approved addresses.

61.     On or about July 3, 2018, the Customer-1 Trader sent additional emails to Thompson seeking an update on the status of the transaction.

62.     Thompson and/or the Escrow Company did not send the 500 Bitcoin to Customer-1's wallet on July 3, 2018, as promised.  Nor did Thompson and/or the Escrow Company maintain Customer-1's cash in the Escrow Bank Account.  Rather, on or about July 3, 2018, the

---

[1]      It is common for parties in cryptocurrency transactions to send the smallest unit of Bitcoin, 0.00000001 Bitcoin, before conducting a larger transaction to ensure that the sender entered the destination wallet address (a long string of letters and numbers) correctly and that the counterparty received the test amount.

same day Customer-1 had wired $2.6 million to the Escrow Bank Account, Thompson wired

approximately $3,090,250 from the Escrow Bank Account to a bank account held by a law firm

in Florida.[2]

63.    Also on July 3, 2018, Thompson wired approximately $100,000 from the Escrow

Bank Account to Account 2.  The $100,000 transferred to Account 2 was then wired to the bank

account for Company A.

64.    On or about July 4, 2018, the Customer-1 Trader emailed Thompson to ask for a

time frame for the delivery of the Bitcoin.  That same day, the Customer-1 Trader and Thompson

engaged in a text message conversation about the Bitcoin transaction.

65.    During the text message conversation, Thompson made several false

representations regarding the status of the trade:

- "Issue should be solved, but getting someone into the back office now to get released just taking time since everybody's a few hours out, I have someone driving back to the office so that they can start the release.  Not sure what time they're ETA is."

- "[Two] party release is required.  It was fixed overnight."

- "I am making [name of employee] drive 3.5 hours back from camping with her fimily [sic] to put it in th [sic] system as she is the closest and on call for the day.  [Transaction will go through] when she is in."

66.    Customer-1 did not receive the 500 Bitcoin in its wallet on July 4, 2018, as

promised by Thompson.

67.    On or about July 5, 2018, at approximately 7:42 am, the Customer-1 COO

emailed Thompson to ask for an update on the transaction.  Shortly thereafter, Thompson

responded that "it is set to clear in the morning batch."

---

[2]    Between on or about June 28, 2018, when Customer-1 had sent approximately $650,000 to the Escrow Bank Account and July 3, 2018, when Customer-1 wired the additional $2.6 million to that account, the Escrow Bank Account received deposits from other entities.

68. Beginning at approximately 9:29 am on July 5, 2018, Thompson and the Customer-1 Trader exchanged numerous text messages about the transaction. In those messages, in sum and substance, the Customer-1 Trader repeatedly inquired about the status of the transaction and Thompson provided false reasons for the delay. For example, at one point, Thompson stated, "I am on the phone fixing the wallet security item from Tuesday, it's a quick fix. . . . Just need to reset." In sworn testimony, Thompson admitted this statement was not accurate and that he was attempting to buy time.

69. Customer-1 did not receive the 500 Bitcoin in its wallet on July 5, 2018, as promised by Thompson.

70. From approximately July 6 to July 8, 2018, Thompson continued to represent to Customer-1 that the Bitcoin transaction would be completed.

71. On or about July 9, 2018, Customer-1 demanded that Thompson return 50% of the $3.25 million that Customer-1 had wired to the Escrow Bank Account. That same day, in a text message to the Customer-1 Trader, Thompson represented that Customer-1 would receive the money back "this afternoon." No money was returned to Customer-1 that day.

72. On or about July 10, 2018, Thompson emailed the Customer-1 Trader and stated: "[First name of the Customer-1 Trader] as I indicated around 1 pm you will get the wire today as soon as we process the items we discussed."

73. The $3.25 million that Customer-1 sent to the Escrow Bank Account in total was never returned to Customer-1, nor did Customer-1 ever receive the 500 Bitcoin it purchased.[3]

**b. Fraud Involving Customer 2**

74. In or about July 2018, Thompson induced Customer-2, after knowingly or recklessly making false representations, to send to the Escrow Company over $4 million to fund

---

[3] Customer-1 did not receive any Bitcoin back other than the 0.00000001 that had been sent as a test.

the purchase of Bitcoin. After receiving Customer-2's money, Thompson sent virtually all of the money to a third party without first receiving any Bitcoin in return. Customer-2 was never provided with any Bitcoin, nor was any money returned to Customer-2. Thompson also lied to Customer-2 about the location of the Bitcoin and the reasons the transaction was not completed.

75.    Customer-2 is a business based in Ireland that trades cryptocurrency.

76.    In or about March 2018, the Chief Executive Office of Customer-2 (the "Customer-2 CEO") spoke with Thompson by phone. During that first call, Thompson provided a high-level overview of how the Escrow Company operated as an escrow agent to eliminate counterparty risk in cryptocurrency transactions.

77.    On or about May 24, 2018, Thompson emailed the Customer-2 CEO documents that provided an overview of the Escrow Company. The overview documents represented that the Escrow Company "provides a global framework of accounts and transaction facilitation infrastructure that minimizes settlement default risk and delays regulatory complexity." The overview documents further represented that it "holds assets in escrow within segmented customer accounts", and that because the Escrow Company is "asset custodian for the both sides of the transaction, there is no risk of default." Finally, the overview documents noted that transactions "are pre-funded and typically settle in real-time."

78.    The overview documents also stated, "As part of the [Escrow Company's] service, compliance is integrated into everything we do," and represented that "[c]ounterparty risk management and compliance-related activities" are provided.

79.    In or about July 2018, the Customer-2 CEO and Thompson began negotiating a Bitcoin transaction for which the Escrow Company would act as an escrow agent. On or about

July 14, 2018, Thompson told the Customer-2 CEO that he had two sellers available and that he was loading the sellers' Bitcoin onto his platform.

80.     On or about July 20, 2018, Customer-2 and the Escrow Company entered into an Escrow Services Agreement (the "Customer-2 Escrow Agreement"), under which Customer-2 engaged the Escrow Company to hold and disburse assets for Customer-2 at Customer-2's direction.  The Customer-2 Escrow Agreement provided that the Escrow Company would receive a one-time escrow fee of 1.5% of each asset deposited with the Escrow Company, plus additional monthly fees at a minimum of $2,500.  Thompson signed the Customer-2 Escrow Agreement on behalf of the Escrow Company as Managing Member.

81.     The Customer-2 Escrow Agreement does not indicate that cash may be transferred out of any party's escrow account into the accounts of third parties before a transaction is completed.  It expressly provides that the Escrow Company "may not assign or delegate its rights or obligations hereunder without the prior written consent of Customer, which may be withheld in Customer's sole discretion."

82.     On or about July 23, 2018, Thompson emailed the Customer-2 CEO and Customer-2's Chief Operating Officer a welcome package outlining the way orders are processed by the Escrow Company.  The welcome package included wire instructions, which stated that funds were to be wired through a bank account in New York, New York.

83.     On or about July 23, 2018, Thompson and the Customer-2 CEO discussed the transaction over the phone.  Thompson reassured the Customer-2 CEO, in sum and substance, that he and/or the Escrow Company had the seller's Bitcoin.  The Customer-2 CEO had made clear to Thompson in prior conversations that Customer-2 would transact with the Escrow

Company only if the Bitcoin was in the Escrow Company's possession, and Thompson agreed to this arrangement.

84.     Separately, on or about July 23, 2018, Thompson emailed a cryptocurrency broker ("Broker") to discuss a transaction involving the purchase of Bitcoin from another company ("Seller-2").  Thompson's email outlined the process for his planned purchase of the Bitcoin from Seller-2.  Thompson's email stated that the Escrow Company would transfer the funds (i.e., what ultimately were Customer-2's funds) to purchase the Bitcoin to a third-party escrow (the "Third-Party Escrow") before the Third-Party Escrow would send the Bitcoin to the Escrow Company on behalf of Seller-2.  Thompson's plan to buy Bitcoin (for Customer-2) by sending Customer-2's funds to a Third-Party Escrow before the Third-Party Escrow provided Seller-2's Bitcoin to the Escrow Company was directly contrary to Thompson's assurances to Customer-2 that its funds would not be transferred until the Bitcoin was in the control of the Escrow Company.

85.     On or about July 24, 2018, Thompson and Seller-2 entered into a contract for the Escrow Company to purchase Bitcoin from Seller-2 (the "Sales Contract").  Under the Sales Contract, the Escrow Company agreed to purchase tranches of Bitcoin from Seller-2 on a weekly basis, at a 6% discount.  The Sales Contract provided that the first tranche would be for 500 Bitcoin, with additional tranches to be decided one week in advance.  The Sales Contract provided that all payments from the Escrow Company for the Bitcoin were to be paid out of a bank account in New York, New York.  An appendix to the Sales Contract provided that the Third-Party Escrow would act as an escrow agent for the transactions.

86.     On or about July 23, 2018, the Customer 2 CEO also asked Thompson to demonstrate that he possessed the Bitcoin that Customer-2 intended to buy.  On or about July 24,

2018, Thompson provided the Customer-2 CEO with a wallet address for the source of Bitcoin controlled by the seller that Thompson claimed would be the "root of the fill" for the Bitcoin that Customer-2 was agreeing to purchase. Thompson attached a report for the wallet address that showed the wallet contained over 10,000 Bitcoin at that time. Thompson did not inform the Customer-2 CEO in that e-mail that he would transfer the money from Customer-2 to a third party before the Bitcoin would be in Thompson's control.

87.     Also on or about July 24, 2018, Thompson emailed the Customer-2 COO with a block order form for Bitcoin transactions. The block order form provided that the order would be for the purchase of up to 6,600 Bitcoin, on a schedule of 500 Bitcoin a day for the week of July 23rd, and 1,000 Bitcoin per day for the week of July 30th. The order form—unlike the similar order form Thompson had provided to Customer-1 in June 2018 and which had resulted in an arbitration proceeding filed against Thompson days prior, on July 17, 2018—further provided that the transaction was a "multi-escrow execution managed by [the Escrow Company]. All processes fit within the process structure outlined above." The order form provided, among other things, that the Escrow Company "validates Fiat Capital and Coin for daily tranche as ready-by 7 am ET." The order form did not explain the term "multi-escrow execution managed by [the Escrow Company]," nor did it state that any money would be transferred out of the escrow account where Customer-2's funds were being held before the Escrow Company or Customer-2 received any Bitcoin.

88.     Based on Thompson's representations to Customer-2 that he and/or the Escrow Company would hold the funds until Thompson and/or the Escrow Company had control of the Bitcoin being purchased, on or about July 24, 2018, Customer-2 executed the block purchase

order and wired €3.6 million from a bank in Europe to the Escrow Bank Account in New York. These funds were received on or about July 25, 2018.

89.     On or about July 27, 2018, the Customer-2 CEO emailed Thompson to confirm that Customer-2 had accepted a trade of 500 Bitcoin at the price of €6,607 per Bitcoin.  The Customer-2 CEO's email further noted that Customer-2 had wired €3.6 million into the Escrow Bank Account, so, at that price per Bitcoin, its balance would be €296,500.50 after the trade. Later that same day, the Customer-2 CEO emailed Thompson, stating, among other things, "Address has been reconfirmed via Telegram, including QR."  Thompson responded to the Customer-2 CEO and stated "Updated wallet address received."

90.     On or about July 27, 2018, three days after receiving Customer-2's funds, without receiving any Bitcoin from the Third-Party Escrow or Seller-2, Thompson converted €3.5 million of Customer-2's €3.6 million into U.S. dollars ($4,066,107.50) and then wired approximately $4,024,914.56 from the Escrow Bank Account to an account held by the Third-Party Escrow.

91.     Customer-2 did not receive the 500 Bitcoin on July 27, 2018, as Thompson promised.

92.     Beginning on or about July 27, 2018, the Customer-2 CEO and Thompson exchanged numerous text messages about the status of the order.  In those text messages, Thompson falsely represented, in sum and substance, that he would be able to release the Bitcoin to Customer-2 once a wire transfer made it to the counterparty's account.  In one message, Thompson stated, "I'm just finding out if they received the wire.  Then I can release."  In another text message on or about July 28, 2018, Thompson continued making false statements to the Customer-2 CEO about the status of the transaction.  Thompson stated that he was "working the

seller outside the escrow [to] force release" and that "worst case" he would go to the executives of the mining groups[4] so they could "override everybody and authorize me to release."

93.    On July 30, 2018, Thompson falsely stated in a message to the Customer-2 CEO: "Just got text the key fragments in to start moving to the hot wallet so we can move out of [Wallet Custodian].  Going to be a few minutes yet (40 is worst case)."

94.    Thompson's statements to Customer-2 CEO were false, because neither he nor the Escrow Company had possession of the Bitcoin at the time, nor did either of them have the ability to release the Bitcoin to Customer-2.

95.    In multiple emails among Thompson and representatives of Seller-2 between on or about July 27 and August 6, 2018, Thompson asked Seller-2 to transfer the Bitcoin to a wallet under Thompson's control.  Rather than merely seeking authorization to release the Bitcoins to Customer-2, in emails on July 28 and July 30, 2018, Thompson asked the seller for "a timeline of coin fill," and complained that the "deadline on delivery of Coin" had passed.

96.    In sworn testimony in a civil proceeding in or about October 2018, Thompson testified, contrary to his statements to the Customer-2 CEO that he would be able to release the coins, that the Bitcoin never came and that while the counterparty was "to this day" telling Thompson they would "deliver coin," he did not believe it.

97.    Customer-2 had not received any Bitcoin by July 31, 2018.  On that day, the Customer-2 CEO emailed Thompson to ask that Thompson either engage in discussions or return the €3.6 million immediately.  No money was returned to Customer-2 that day.

98.    In fact, days later, on or about August 8, 2018, Thompson converted the remaining €100,000 of Customer-2's money to U.S. dollars (worth $115,620.80) and, rather than

---

[4]    Bitcoin mining is the process of verifying transactions that are added to the Bitcoin blockchain, for which the miner receives newly-created Bitcoin.

returning it to Customer-2, transferred $100,000 to Account 2.  Just as he had done with

Customer-1's money, Thompson then wired the $100,000 from Account 2 to account in the

name of Company A.

99.     The Bitcoin transaction between Customer-2 and the Escrow Company was never

completed.  Customer-2 never received any Bitcoin and none of the €3.6 million sent by

Customer-2 was returned to Customer-2.

**B.     Conclusions of Law**

**1.  Jurisdiction and Venue**

100.     This Court possesses jurisdiction over this action pursuant to 28 U.S.C. § 1331

(2018) (codifying federal question jurisdiction) and 28 U.S.C. § 1345 (2018) (providing that U.S.

district courts have original jurisdiction over civil actions commenced by the United States or by

any agency expressly authorized to sue by Act of Congress). Section 6c(a) of the Act, 7 U.S.C.

§ 13a-1(a) (2018), provides that the Commission may bring actions for injunctive relief or to

enforce compliance with the Act or any rule, regulation, or order thereunder in the proper district

court of the United States whenever it shall appear to the Commission that any person has

engaged, is engaging, or is about to engage in any act or practice constituting a violation of any

provision of the Act or any rule, regulation, or order thereunder.

101.     Venue properly lies with this Court pursuant to 7 U.S.C. § 13a-1(e), because

Thompson transacted business in this District and acts and practices in violation of the Act

occurred within this District.

**2.  Violations of the Act and Regulations**

102.     By the conduct described in paragraphs 1 through 101 above, Defendant, directly

or indirectly, in connection with a commodity in interstate commerce, namely Bitcoin,

intentionally or recklessly: (1) used or employed, or attempted to use or employ, manipulative devices, schemes, or artifices to defraud, (2) made, or attempted to make, any untrue or misleading statement of a material fact or omitted to state a material fact necessary in order to make the statements made not untrue or misleading, or (3) engaged, or attempted to engage, in acts, practices, or courses of business, which operated or would have operated as a fraud or deceit upon market participants, in violation of Section 6(c)(1) of the Act, 7 U.S.C. § 9(1) (2018), and Regulation 180.1(a), 17 C.F.R. § 180.1(a) (2019).

103. Unless restrained and enjoined by this Court, there is a reasonable likelihood that Thompson will continue to engage in the acts and practices alleged in the Complaint and in similar acts and practices in violation of the Act and Regulations.

## IV. PERMANENT INJUNCTION

**IT IS HEREBY ORDERED THAT:**

104. Based upon and in connection with the foregoing conduct, pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1 (2018), Defendant is permanently restrained, enjoined and prohibited from, directly or indirectly, in connection with any swap, or contract of sale of any commodity in interstate commerce, or contract for future deliver on or subject to the rules of any registered entity, intentionally or recklessly: (1) using or employing, or attempting to use or employ, any manipulative device, scheme or artifice to defraud, (2) making, or attempting to make, any untrue or misleading statement of a material fact or to omit to state a material fact necessary in order to make the statements made not untrue or misleading, or (3) engaging, or attempting to engage, in any act, practice, or course of business, which would operate as a fraud or deceit upon any person, in violation of Section 6(c)(1) of the Act, 7 U.S.C. § 9(1) (2018), and Regulation 180.1(a), 17 C.F.R. § 180.1(a) (2019).

105.     Defendant is also permanently restrained, enjoined and prohibited from directly or indirectly:

a.     Trading on or subject to the rules of any registered entity (as that term is defined in Section 1a(40) of the Act, 7 U.S.C. § 1a(40) (2018));

b.     Entering into any transactions involving "commodity interests" (as that term is defined in Regulation 1.3, 17 C.F.R. § 1.3 (2019)) and/or Bitcoin for his own personal account or for any account in which he has a direct or indirect interest;

c.     Having any commodity interests and/or Bitcoin, traded on his behalf;

d.     Controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity interests and/or Bitcoin;

e.     Soliciting, receiving or accepting any funds from any person for the purpose of purchasing or selling any commodity interests and/or Bitcoin;

f.     Applying for registration or claiming exemption from registration with the Commission in any capacity, and engaging in any activity requiring such registration or exemption from registration with the Commission, except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2019); and/or

g.     Acting as a principal (as that term is defined in Regulation 3.1(a), 17 C.F.R. § 3.1(a) (2019)), agent or any other officer or employee of any person (as that term is defined in 7 U.S.C. § 1a(38) (2018)), registered, exempted from registration or required to be registered with the Commission except as provided for in 17 C.F.R. § 4.14(a)(9).

## V.   RESTITUTION

### A.   Restitution

106.    Defendant shall pay restitution in the amount of seven million four hundred thirty-one thousand seven hundred twenty-eight dollars and thirty cents ($7,431,728.30) ("Restitution Obligation"), within ten days of entry of this Consent Order.  If the Restitution Obligation is not paid immediately, post-judgment interest shall accrue on the Restitution Obligation beginning on the date of the date of entry of this Consent Order and shall be determined by using the Treasury Bill rate prevailing on the date of entry of this Consent Order pursuant to 28 U.S.C. § 1961 (2018).

107.    For payments made in satisfaction of any restitution ordered in the Criminal Action ("Criminal Restitution Obligation"), Defendant Thompson shall receive a dollar-for-dollar credit against the Restitution Obligation.  Within ten days of disbursement in the Criminal Action to Thompson's customers, Defendant shall, under a cover letter that identifies the name and docket number of this proceeding, transmit to the Chief Financial Officer, Commodity Futures Trading Commission, Three Lafayette Centre, 1155 21st Street, NW, Washington, D.C. 20581, and the Office of Administration, National Futures Association, 300 South Riverside Plaza, Suite 1800, Chicago, Illinois 60606, copies of the form of payment to those customers.

108.    To effect payment of the Restitution Obligation and the distribution of any restitution payments to Customer-1 and Customer-2, the Court appoints the National Futures Association ("NFA") as Monitor ("Monitor").  The Monitor shall receive restitution payments from Defendant and make distributions as set forth below.  Because the Monitor is acting as an officer of this Court in performing these services, the NFA shall not be liable for any action or inaction arising from NFA's appointment as Monitor, other than actions involving fraud.

109.     Defendant shall make Restitution Obligation payments, and any post-judgment interest payments, under this Consent Order to the Monitor in the name "Thompson-Restitution Fund" and shall send such payments by electronic funds transfer, or by U.S. postal money order, certified check, bank cashier's check, or bank money order, to the Office of Administration, National Futures Association, 300 South Riverside Plaza, Suite 1800, Chicago, Illinois 60606 under cover letter that identifies the paying Defendants and the name and docket number of this proceeding.  Defendants shall simultaneously transmit copies of the cover letter and the form of payment to the Chief Financial Officer, Commodity Futures Trading Commission, Three Lafayette Centre, 1155 21st Street, NW, Washington, D.C. 20581.

110.     The Monitor shall oversee the Restitution Obligation and shall have the discretion to determine the manner of distribution of such funds in an equitable fashion to Customer-1 and Customer-2 identified by the Commission or may defer distribution until such time as the Monitor deems appropriate.

111.     Defendant shall cooperate with the Monitor as appropriate to provide such information as the Monitor deems necessary and appropriate to identify Customer-1 and Customer-2 to whom the Monitor, in its sole discretion, may determine to include in any plan for distribution of any Restitution Obligation payments.  Defendant shall execute any documents necessary to release funds that he has in any repository, bank, investment or other financial institution, wherever located, in order to make partial or total payment toward the Restitution Obligation.

112.     The Monitor shall provide the Commission at the beginning of each calendar year with a report detailing the disbursement of funds to Customer-1 and Customer-2 during the previous year.  The Monitor shall transmit this report under a cover letter that identifies the name

and docket number of this proceeding to the Chief Financial Officer, Commodity Futures

Trading Commission, Three Lafayette Centre, 1155 21st Street, NW, Washington, D.C. 20581.

113.    The amounts payable to each customer shall not limit the ability of any customer

from proving that a greater amount is owed from Defendant or any other person or entity, and

nothing herein shall be construed in any way to limit or abridge the rights of any customer that

exist under state or common law.

114.    Pursuant to Rule 71 of the Federal Rules of Civil Procedure, each customer of

Defendant who suffered a loss is explicitly made an intended third-party beneficiary of this

Consent Order and may seek to enforce obedience of this Consent Order to obtain satisfaction of

any portion of the restitution that has not been paid by Defendant to ensure continued

compliance with any provision of this Consent Order and to hold Defendant in contempt for any

violations of any provision of this Consent Order.

115.    To the extent that any funds accrue to the U.S. Treasury for satisfaction of

Defendant's Restitution Obligation, such funds shall be transferred to the Monitor for

disbursement in accordance with the procedures set forth above.

**B.      Provisions Related to Monetary Sanctions**

116.    Partial Satisfaction:  Acceptance by the Commission/CFTC or the Monitor of any

partial payment of Defendant's Restitution Obligation shall not be deemed a waiver of his

obligation to make further payments pursuant to this Consent Order, or a waiver of the

Commission/CFTC's right to seek to compel payment of any remaining balance.

**C.      Cooperation**

117.    Defendant shall cooperate fully and expeditiously with the Commission/CFTC,

including the Commission/CFTC's Division of Enforcement, in this action, and in any current or

future Commission/CFTC investigation or action related thereto.  Defendant shall also cooperate

in any investigation, civil litigation, or administrative matter related to, or arising from, this

action.

## VI.        MISCELLANEOUS PROVISIONS

118.    Notice:  All notices required to be given by any provision in this Consent Order

shall be sent certified mail, return receipt requested, as follows:

Notice to Commission:

>   Manal M. Sultan
>   Deputy Director
>   Commodity Futures Trading Commission
>   140 Broadway, 19th Floor
>   New York, NY 10005

Notice to Defendant:

>   Jon Barry Thompson
>   131 W. Burke St.
>   Easton, PA 18042

All such notices to the Commission shall reference the name and docket number of this action.

119.    Change of Address/Phone:  Until such time as Defendant satisfies in full his

Restitution Obligation, as set forth in this Consent Order, Defendants shall provide written notice

to the Commission by certified mail of any change to his telephone number and mailing address

within ten calendar days of the change.

120.    Entire Agreement and Amendments:  This Consent Order incorporates all of the

terms and conditions of the settlement among the parties hereto to date.  Nothing shall serve to

amend or modify this Consent Order in any respect whatsoever, unless:  (a) reduced to writing;

(b) signed by all parties hereto; and (c) approved by order of this Court.

121.    Invalidation:  If any provision of this Consent Order or if the application of any

provision or circumstance is held invalid, then the remainder of this Consent Order and the

application of the provision to any other person or circumstance shall not be affected by the holding.

122.    Waiver:  The failure of any party to this Consent Order or of any customer at any time to require performance of any provision of this Consent Order shall in no manner affect the right of the party or customer at a later time to enforce the same or any other provision of this Consent Order.  No waiver in one or more instances of the breach of any provision contained in this Consent Order shall be deemed to be or construed as a further or continuing waiver of such breach or waiver of the breach of any other provision of this Consent Order.

123.    Waiver of Service, and Acknowledgement:  Defendant waives service of this Consent Order and agrees that entry of this Consent Order by the Court and filing with the Clerk of the Court will constitute notice to the Defendant of its terms and conditions.  Defendant further agrees to provide counsel for the Commission, within thirty days after this Consent Order is filed with the Clerk of Court, with an affidavit or declaration stating that Defendant has received and read a copy of this Consent Order.

124.    Continuing Jurisdiction of this Court:  This Court shall retain jurisdiction of this action to ensure compliance with this Consent Order and for all other purposes related to this action, including any motion by Defendant to modify or for relief from the terms of this Consent Order.

125.    Injunctive and Equitable Relief Provisions:  The injunctive and equitable relief provisions of this Consent Order shall be binding upon Defendant, upon any person under his authority or control, and upon any person who receives actual notice of this Consent Order, by personal service, e-mail, facsimile or otherwise insofar as he or she is acting in active concert or participation with Defendant.

126.     Counterparts and Facsimile Execution:  This Consent Order may be executed in two or more counterparts, all of which shall be considered one and the same agreement and shall become effective when one or more counterparts have been signed by each of the parties hereto and delivered (by facsimile, e-mail, or otherwise) to the other party, it being understood that all parties need not sign the same counterpart.  Any counterpart or other signature to this Consent Order that is delivered by any means shall be deemed for all purposes as constituting good and valid execution and delivery by such party of this Consent Order.

127.     Contempt:  Defendant understands that the terms of the Consent Order are enforceable through contempt proceedings, and that, in any such proceedings he may not challenge the validity of this Consent Order.

128.     Agreements and Undertakings:  Defendant shall comply with all of the undertakings and agreements set forth in this Consent Order.

There being no just reason for delay, the Clerk of the Court is hereby ordered to enter this *Consent Order for Permanent Injunction, Civil Monetary Penalty, and Other Equitable Relief Against Defendant Jon Barry Thompson* forthwith and without further notice.

**IT IS SO ORDERED** on this  1st  day of _____October_____, 2020.

_____
**UNITED STATES DISTRICT JUDGE**

CONSENTED TO AND APPROVED BY:

_____
Jon Barry Thompson
131 W. Burke St.
Easton, PA 18042

Dated: ___7-Aug-2020___

_____
Steven Ringer
Chief Trial Attorney
Commodity Futures Trading Commission
140 Broadway, 19th Floor
646-746-9700
sringer@cftc.gov

Dated ___9/30/2020___